Filed 12/4/15; pub. order 12/17/15 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re D.C. et al., Persons Coming Under the Juvenile Court Law. | |
| | D068146 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519166A-C) |
| v. | |
| M.J. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge. Affirmed in part; vacated in part; remanded with directions.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant M.J.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant C.C.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego, Tilisha Martin, Carolyn Levenberg and Beth Ploesch for Minors.

M.J. and C.C. appeal the orders entered following the jurisdiction and disposition hearing in the juvenile dependency case of their minor children, D.C., Ce.C., and F.C. M.J. contends the evidence was insufficient to support the court's dispositional order removing the minors from her custody under Welfare and Institutions Code[1] section 361, subdivision (c)(1), and the court erred by not complying with the notice provisions of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA). C.C. contends the evidence was insufficient to support the court's jurisdictional findings under section 300, subdivisions (d) and (j); the court erred by approving provisions in his case plan requiring him to admit to sexual abuse of D.C.; and the court erred by limiting his educational rights over Ce.C. and F.C. C.C. also joins in M.J.'s contentions.

We conclude the juvenile court erred by finding ICWA inapplicable to this case without providing notice to the tribes in which C.C. claimed potential membership. We therefore vacate the court's ICWA finding and remand with directions to provide such notice. In all other respects, we disagree with M.J. and C.C.'s contentions and affirm.

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND

"In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

On March 24, 2015, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (d), on behalf of 13-year-old D.C. and under section 300, subdivision (j), on behalf of 10-year-old Ce.C. and nine-year-old F.C. The minors lived with M.J. and C.C., an unmarried couple who had adopted them after a previous dependency case involving the minors. The Agency alleged C.C. had sexually abused D.C., including by having sexual intercourse with her and forcing her to orally copulate him. The Agency further alleged M.J. had allowed C.C. back into the family home following D.C.'s disclosure of abuse, despite Agency intervention and an Agency safety plan. The Agency concluded D.C. had been sexually abused, or there was a substantial risk D.C. would be sexually abused, and there was a substantial risk that Ce.C. and F.C. would be abused or neglected.

A month earlier, the Agency had received a referral that D.C. had been sexually abused by C.C. The Agency and law enforcement initiated investigations. D.C. disclosed the abuse to a school counselor, who reported that D.C. first said C.C. was "sexually harassing" her. D.C. then said she had had intercourse with C.C.; the last time was three months prior to the conversation. D.C. told the counselor C.C. touched her breasts, her vagina, and her buttocks, as well as forced her to orally copulate him. In a forensic interview, D.C. disclosed multiple acts of penile-vaginal penetration, digital-

3

vaginal penetration, and digital-anal penetration by C.C., often accompanied by violence. D.C. said C.C. also placed his penis in her mouth and ejaculated. The most recent abuse occurred the day before the interview. During that incident, C.C. tried to pull down D.C.'s pants, but she fled and locked herself in the bathroom. C.C. started banging on the bathroom door, which prompted Ce.C. to come out of her room. C.C. then went to the garage.

C.C. was served with an emergency protective order and left the family home. M.J. agreed to a voluntary safety plan prohibiting any contact between C.C. and the minors pending the Agency's investigation. The minors remained in M.J.'s care.

The Agency continued its investigation. An Agency social worker spoke with the minors' maternal aunt, to whom D.C. had also disclosed sexual abuse. The maternal aunt reported that D.C. said she had vaginal intercourse with C.C. three times. D.C. told the maternal aunt C.C.'s abuse was violent, with C.C. hitting D.C. on the head, twisting her neck and wrists, and picking her up. D.C. said she tried to tell M.J. about the abuse a year ago, when C.C. asked M.J. to pull her skirt down or pull it up. D.C. said C.C. responded by "twisting the story around." The maternal aunt said she believed D.C. and could not see her making up the allegations. The maternal aunt told the Agency she had seen C.C. angry before and witnessed him hitting a car dashboard at a social softball game. D.C. had told the maternal aunt that C.C. kicked in her bedroom door when she took too long to get dressed; the maternal aunt confirmed the door was "jiggly" as a result. The Agency also uncovered text messages D.C. sent to a friend prior to the referral consistent with her disclosures of abuse. In interviews, Ce.C. and F.C. denied

4

any abuse. Ce.C. also denied hearing C.C. banging on the bathroom door, as D.C. alleged.

M.J. told an Agency social worker she was concerned D.C. was not telling the truth. M.J. said D.C. had lied about having a boyfriend and may have wanted to get C.C. out of the house because he was more strict with her. M.J. thought some of D.C.'s disclosures were reminiscent of themes from a movie, "50 Shades of Gray," which D.C. may have seen. C.C. declined to make a statement and did not discuss the substance of the allegations with the Agency. He said he did not want to have contact with D.C. until " 'she gets her head straight.' " He wanted to see Ce.C. and F.C. and expressed concern for their well-being.

Several weeks later, the Agency learned that M.J. violated the safety plan by allowing C.C. to stay overnight at the family home, with Ce.C. and F.C., while D.C. was away. M.J. told the Agency she "could not remember the fine print of the safety plan" and said it was voluntary. M.J. said Ce.C. and F.C. miss C.C. and " 'it's not fair they're going through this because [D.C.] is doing this. They are safe.' " M.J. said D.C. was " 'totally fine. She's doing what she wants . . . boys call at 2 a.m. . . . she's wearing makeup even though she's not supposed to.' "

The Agency filed the instant petitions. At the detention hearing, the court found the Agency had made a prima facie showing under section 300, subdivisions (d) and (j). The court ordered the minors detained in out-of-home care. The court ordered supervised visitation with the minors for M.J. and supervised visitation with Ce.C. and F.C. for C.C. The minors were placed at Polinsky Children's Center.

In conversations with an Agency social worker, D.C. said she would like to live with M.J., Ce.C., and F.C. She did not want to have any future contact with C.C. D.C. said she was concerned that M.J. did not believe her and was looking for proof that D.C. was lying. D.C. said she and M.J. do not trust each other. On a scale of one to 10 (with 10 being completely truthful), D.C. said the truth of what she said in her interviews was about a 9.5. D.C. explained that everything she said was true but she might not have gotten the order exactly correct.

At Polinsky, Ce.C. told an Agency social worker C.C. had physically abused her, including by hitting Ce.C. in the face twice with an open hand. Ce.C. also said C.C. hit and kicked F.C. and once slapped D.C. Ce.C. disclosed that C.C. throws and breaks things when angry, including a glass vase. On a scale of one to 10 (with 10 being completely safe), Ce.C. said she feels like "one" when C.C. is mad. When C.C. is not mad, Ce.C. said she feels like "four" because C.C. is "still grumpy and yells a lot." When Ce.C. is with only M.J., Ce.C. said she feels like a "10." Ce.C. smiled when she was asked about M.J.

Ce.C. denied any sexual abuse. However, when the Agency social worker asked Ce.C. what M.J. would say if she were sexually abused, Ce.C. said, " 'She would get my dad and yell at him a lot or at someone else who's doing it.' " Ce.C. then became concerned that the social worker had written down the word "dad" and asked the social worker to erase it. Without prompting, Ce.C. said, " 'Sometimes when I come home and it's just my dad and my sister [D.C.] alone, my sister is crying, and I don't know why.' " Ce.C. gave several examples, including one incident in which she came home, D.C. and

6

C.C. were in D.C.'s room, and D.C. came out crying. Ce.C. said C.C. went " 'away with a mad face' " after that. Ce.C. described another incident in which she heard D.C. scream and C.C. said, " 'Don't push me.' " Regarding another incident, Ce.C. said, " 'One time my dad was on top of my sister, and my sister was crying, and my dad was smacking her.' " D.C was on the ground, and C.C. was on his knees straddling her. D.C. kept saying " 'stop' " to C.C. In all of the incidents, Ce.C. had just arrived home from a friend's house.

F.C. did not disclose any physical or sexual abuse. At Polinsky, he told an Agency social worker that he missed his parents. During an exercise called the "Three Houses," F.C. listed C.C., M.J., his sisters, and his dog in his "House of Good Things." In his "House of Worries," F.C. wrote that he did not think he would see C.C. or M.J. for a while. He told the Agency social worker he did not know why the Agency did not think it was safe for him to live with C.C. and M.J.

C.C. told the Agency he did not want to take sexual abuse classes because he would be required to admit abusing D.C. C.C. said D.C.'s allegations were " 'flat out lies' " and he had " 'no idea' " why D.C. would make them. On the day of the last reported incident, C.C. said D.C. had gotten in trouble because she was throwing food and having a lot of " 'physical contact' " with a boy. C.C. said D.C. is " 'boy crazy' " and is difficult and defiant. C.C. said he was strict with D.C. but not abusive. C.C. said he did not want to have any visitation with D.C. and did not want any further relationship with her.

In conversations with the Agency, M.J. would not say whether she believed D.C.'s allegations. However, M.J. said, " '[D.C.] lies all the time. She won't tell us anything.' " For example, M.J. said D.C. lied about what "bae" meant. M.J. said D.C. had never lied about sexual abuse before. M.J. told the Agency D.C. was " 'living a whole different life we didn't know about,' " including receiving a sexually explicit text message, receiving calls late at night from boys, and skipping her after school program. M.J. said she asked D.C. about the allegations, but she treated it like a joke. M.J. said D.C. denied ever being forced to orally copulate C.C.

D.C.'s school counselor was not aware of any history of D.C. lying, making up stories, or causing trouble at school. The counselor was also not aware of any mental health or developmental issues. The counselor said M.J.'s apparent disbelief of D.C.'s disclosures "hurts" her.

In its assessment, the Agency characterized D.C.'s allegations as consistent across her various disclosures and at least partially corroborated by Ce.C.'s statements. The Agency concluded " 'the evidence weighs far more heavily that the allegations are true than that they are not.' " The Agency believed F.C. and Ce.C. were at risk of sexual and physical abuse by C.C., given D.C.'s disclosures of sexual abuse and Ce.C.'s disclosures of physical abuse. The Agency also believed placement with M.J. would be inadequate to protect them, based primarily on M.J.'s failure to follow the safety plan prohibiting C.C. from seeing the minors. The Agency was troubled that M.J. encouraged Ce.C. and F.C. to keep C.C.'s visit a secret and concerned M.J. might lead Ce.C. and F.C. to withhold further information regarding threats to their safety.

8

The Agency recommended that the juvenile court sustain the allegations of the petition and remove the minors from the care and custody of their parents. M.J. and C.C. requested a trial on jurisdiction and disposition.

Prior to trial, the Agency scheduled a team decision-making meeting (TDM) to discuss supervised visitation for the minors. M.J., C.C., the minors' paternal grandparents, and a family friend attended. M.J. and C.C. declined to discuss the details of D.C.'s allegations. During the TDM, C.C. disclosed that D.C. made some sort of accusation against him a year ago, and they agreed he and D.C. would not be alone together. However, C.C. said D.C. still wanted to spend time with him. After that disclosure, an Agency social worker said he wanted to respect C.C.'s wish not to discuss the allegations during the TDM, and M.J. told C.C. he should not talk about it.

Later, in another conversation with the Agency, C.C. provided further details about the accusation. C.C. said D.C. had told M.J. that C.C. told D.C. to take off her skirt. C.C. denied making the statement; he said he only told D.C. to flip down her skirt to avoid showing her underwear. Regarding Ce.C.'s comments about abuse, C.C. said, " 'I don't want to say Ce.C. is making it up, but she could be saying what you want to hear.' " C.C. claimed D.C. had punched him, pushed him, and slammed the door in his face. C.C. did not say anything about these incidents because he was embarrassed.

The minors had mixed experiences at Polinsky. D.C. left Polinsky at night without permission multiple times. On one occasion, she smelled like alcohol when she returned. On other occasion, she had been smoking marijuana. D.C. told the Agency she

9

had consensual sexual contact with a boy while at Polinsky. The boy denied any sexual contact to Polinsky staff. Polinsky staff claimed D.C. had not been left unattended.

F.C. refused to go to sleep, kicked and hit Polinsky staff, and tried to grab the " 'private body areas' " of Polinsky staff. F.C. threatened suicide and was placed on a psychiatric hold. He was not hospitalized. F.C.'s psychiatrist recommended additional psychotropic medication. (He was already taking Adderall.) F.C.'s schoolteacher reported his behavior had been difficult but similar to the time before he was placed in Polinsky. Prior to the case, F.C. had been diagnosed with attention deficit hyperactivity disorder and oppositional defiance disorder. D.C. also reported F.C. acted about the same as at home.

The Agency reported that C.C. had called D.C.'s school several times. School officials felt C.C. was harassing them and were concerned D.C. might become aware of C.C.'s calls. The Agency therefore recommended limiting C.C.'s educational rights to the minors and vesting educational rights solely with M.J. The Agency also reported that M.J. did not start any services until two months after the minors were detained.

At the contested jurisdiction and disposition hearing, the juvenile court received several Agency reports into evidence and heard testimony from an Agency social worker. Among other things, the social worker explained that D.C.'s defiant behaviors were not surprising, given the sexual abuse she suffered. The social worker believed M.J. had not demonstrated any progress addressing the protective issues in the case, including because she had delayed accessing services. Although it was not formally entered into evidence, the court also reviewed a video recording of D.C.'s forensic interview.

The juvenile court sustained the allegations of the petitions. Although the court noted some inconsistencies and improbabilities in specific portions of D.C.'s disclosures, the court concluded that the Agency had proven the allegations of sexual abuse true by a preponderance of the evidence. The court found persuasive the substance of D.C.'s disclosure, its substantial consistency across her various statements, and Ce.C.'s partial corroboration. The court stated, "I think there are gaps in the picture, but certainly the Agency has met its burden by a preponderance of the evidence." The court removed the minors from C.C. and M.J.'s custody, ordered reunification services for both parents, and vested educational rights solely with M.J. M.J. and C.C. appeal.

## DISCUSSION

## I

C.C. challenges the juvenile court's jurisdictional findings under section 300, subdivision (d), as to D.C. and section 300, subdivision (j), as to F.C.[2] Section 300 provides, in relevant part, as follows: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent of the court: [¶] . . . [¶] (d) The child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household . . . . [¶] . . . [¶] (j) The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child

---

[2]    C.C. does not directly challenge the court's jurisdictional finding as to Ce.C., except as it may be affected by a reversal of the finding as to D.C.

will be abused or neglected, as defined in those subdivisions.  The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

We review the court's jurisdictional findings for substantial evidence.  " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.  [Citations]  ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." '  [Citation.]" [Citation.]' "  (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)  " 'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.' "  (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140; see *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.)  "The appellant has the

burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order."  (*In re R.V.* (2012) 208 Cal.App.4th 837, 843 (*R.V.*).)

As to D.C., it cannot reasonably be questioned that her disclosures, if believed, reveal sexual abuse under section 300, subdivision (d).  (See Pen. Code, § 11165.1, subds. (b)(1) [including penile penetration of the vagina]; (b)(2) [including sexual contact between mouth and penis]; (b)(3) [including digital penetration of the vagina or anus]; and (b)(4) [including intentional touching of genitals or other intimate parts for sexual purposes].)  Based on our review of the whole record, the juvenile court was entitled to find D.C.'s disclosures credible.[3]  The minor inconsistencies C.C. identifies, which the juvenile court largely considered as well, do not make D.C.'s disclosures unreliable or incredible.  Her disclosures are therefore substantial evidence of sexual abuse and sufficient to support the juvenile court's jurisdictional finding.  (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["Evidence from a single witness, even a party, can be sufficient to support the trial court's findings."].)

C.C. argues the juvenile court could have avoided a true finding on the Agency's petition based on sexual abuse by making a true finding based on C.C. and M.J.'s failure

---

[3]    Our review includes summaries of D.C.'s disclosures during her forensic interview that the Agency included in its reports.  It does not include the video of the interview, viewed by the juvenile court but not formally offered into evidence or included in the record on appeal.  The Agency filed a motion to augment and correct the record to include this video and a transcript of the interview, arguing this evidence further supported the juvenile court's jurisdictional findings.  C.C. opposed.  Because we conclude the evidence supports the juvenile court's findings even without the video and transcript of the forensic interview, we deny the Agency's motion.

to protect. C.C. claims that procedure would have been beneficial because it would have allowed the Agency more time to investigate D.C.'s disclosures.[4] Our standard of review prohibits second-guessing the juvenile court in the manner C.C. suggests. We review the finding the juvenile court actually made, not whether other findings could have been made that would accomplish a similar result. C.C. has not shown the evidence did not support the juvenile court's finding of sexual abuse.

As to F.C., we likewise conclude the evidence supported the juvenile court's jurisdictional finding under section 300, subdivision (j). "Subdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions." (*I.J., supra*, 56 Cal.4th at p. 774.) " '[S]ubdivision (j) was intended to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i). Subdivision (j) *does not* state that its application is limited to the risk that the child will be abused or neglected *as defined in the same subdivision* that describes the abuse or neglect of the sibling. Rather, subdivision (j) directs the trial court to consider whether

_____

4     C.C. focuses on the alleged need for the Agency to investigate D.C.'s disclosure of sexual contact with a boy at Polinsky. C.C. characterizes this disclosure as "the key fact the minor [D.C.] made apparently false allegations of sexual behavior against another minor at the Polinsky center." D.C.'s disclosure was not proven false, however. The boy and Polinsky staff merely disputed D.C.'s statement. The juvenile court could have reasonably believed D.C. was telling the truth. Moreover, even if it were false, a false statement regarding *consensual* sexual contact by D.C. would not make the juvenile court's true finding on her disclosure of sexual abuse against C.C. unreasonable. It is for the juvenile court, not this court, to assess the questions of credibility and evidentiary weight C.C. raises.

14

there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) *or* (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling.' " (*Ibid.*) Because the assessment of risk to a sibling depends in part on the circumstances of an abused or neglected child, "subdivision (j) implies that the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings." (*Id.* at p. 778.)

In *I.J.*, the Supreme Court considered dependency petitions filed on behalf of a sexually abused 14-year-old girl and her four siblings, twin 12-year-old boys, a nine-year-old girl, and a boy about to turn eight years old. (*I.J., supra*, 56 Cal.4th at p. 771.) The girl's father forcibly raped the older daughter, fondled and digitally penetrated her vagina, and forced her to watch pornographic videos with him. (*Ibid.*) Jurisdiction over the daughters had been affirmed by the Court of Appeal and was not at issue in the Supreme Court. (*Id.* at p. 772.) As to the sons, although there was no evidence the father had abused them or even that they were aware of their father's behavior, the Supreme Court affirmed the juvenile court's finding that the sons were placed in substantial risk of abuse or neglect by the father's actions. (*Id.* at pp. 771, 778.) " 'Although the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial.' " (*Id.* at p. 780.)

The reasoning and conclusion of *I.J.* applies equally to this case. Here, as in *I.J.*, C.C.'s behavior was " 'aberrant in the extreme[.]' " (*I.J., supra*, 56 Cal.4th at p. 778.) C.C. had sexual intercourse with his own daughter, digitally penetrated her anus and

15

vagina, and demanded she orally copulate him, often accompanied by physical violence or threats of violence. As in *I.J.*, "Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse." (*Ibid.*) In addition, Ce.C. made credible disclosures of physical abuse perpetrated by C.C. against her and F.C. Under these circumstances, the evidence supports the juvenile court's finding that F.C. (as well as Ce.C.) was at substantial risk of abuse or neglect. (See *id*. at p. 778; see also *In re Karen R.* (2001) 95 Cal.App.4th 84, 90-91.)

C.C. points out that the abused child in *I.J.* was slightly younger than D.C. when the abuse started (11 years old versus 12) and the child in *I.J.* was abused for a longer time period (three years versus one). These factual differences provide no basis to distinguish *I.J.* and do not undermine the juvenile court's jurisdictional findings. C.C. also points to evidence that F.C. felt safe with him, missed him, and cried because he would not see C.C. or M.J. for a while. F.C.'s subjective feelings, however, do not dictate the juvenile court's assessment of the risk to him. As in *I.J.*, the record amply supports the juvenile court's findings of substantial risk of abuse based on C.C.'s prolonged and severe sexual abuse of D.C. (See *I.J., supra*, 56 Cal.4th at p. 778.)

## II

M.J. challenges the court's dispositional order removing Ce.C. and F.C. from her custody. M.J. does not contend the court erred in removing D.C. C.C. joins in M.J.'s challenge.

16

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1).)

"By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the 'bias of the controlling statute is on family preservation, *not* removal.' "  (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*).)  However, " ' "[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  [Citation.]  The court may consider a parent's past conduct as well as present circumstances.  [Citation.]' "  (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

We review the juvenile court's dispositional order under the same standard of review as the court's jurisdictional findings, which we have already explained.  (*Hailey T., supra*, 212 Cal.App.4th at p. 146 ["The standard of review of a dispositional order on appeal is the substantial evidence test."]; see *I.J., supra*, 56 Cal.4th at p. 773.)  The burden remains on the appellant to show "there is no evidence of a sufficiently substantial nature to support the court's findings or orders."  (*Hailey T.,* at p. 147.)

17

The evidence here supports the juvenile court's removal order. The record shows M.J. did not protect D.C. from C.C.'s year-long course of sexual abuse, minimized and denied D.C.'s attempt to disclose that abuse when it began, violated the Agency's voluntary safety plan by allowing C.C. to stay overnight with Ce.C. and F.C. after D.C. disclosed the full extent of her abuse, was skeptical (at best) of the truth of D.C.'s disclosure at the time of the disposition hearing, and unreasonably delayed beginning reunification services.[5] The record further shows that M.J. wanted to shield the details of D.C.'s disclosure from family members and friends, thereby preventing them (in the opinion of an Agency social worker) from supporting the minors' safety. The juvenile court was entitled to credit this evidence and conclude removal was the only reasonable means to protect the minors' safety. (See *R.V., supra*, 208 Cal.App.4th at p. 841.)

M.J. contends her conduct was not as egregious as the conduct of the parent in *R.V.*, who violated a court order and had ongoing mental health and substance abuse issues. (See *R.V., supra*, 208 Cal.App.4th at p. 842.) *R.V.* did not imply, however, that its facts constituted the minimum showing required for removal. The facts here are also sufficient to support removal for the reasons we have discussed.

M.J. also emphasizes contrary evidence, including her separation from C.C. and her participation in services. Under the applicable standard of review, however, "we do

---

5     Unlike *In re Henry V.* (2004) 119 Cal.App.4th 522, 530, the minors' removal was not intended as an incentive to encourage M.J.'s participation in reunification services. The juvenile court here could properly view M.J.'s delay in seeking services as evidence of a lack of commitment to resolve the protective issues involved in the case, among other things.

18

not pass on the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence." (*Hailey T., supra*, 212 Cal.App.4th at p. 146.) Weighing the evidence M.J. cites against contrary evidence is exclusively the province of the juvenile court; we may not substitute our judgment for that of the juvenile court in this regard. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918.) Similarly, although M.J. points to other measures short of removal she contends would have protected the minors, she has not shown the court's removal order was not supported by substantial evidence given the facts we have discussed. The evidence supports the finding that the measures M.J. suggests, including "in-home services, unannounced visits, and therapy for the parties," would not have addressed the substantial risk evident in leaving the minors with M.J. unsupervised. Substantial evidence supports the court's dispositional order.

III

C.C. contends the court erred by requiring him to admit sexual abuse of D.C. in various forms as part of his case plan. The service objectives of his case plan included the following: "[C.C.] will write a list of triggers that led him to sexually touch [D.C.]" and "[C.C.] will write a letter of apology to each of his children explaining his role in the sexual abuse and what exactly he is doing to commit to ensure that none of the children are ever sexually abused in the future." C.C.'s case plan also required him to participate in group therapy for "perpetrators of sexual abuse" with an approved therapist. C.C. told the Agency he was required to sign a form "basically admitting that he had abused a child" to participate in group therapy.

19

"With some limited exceptions not relevant here, section 361.5 requires the juvenile court to order child welfare services for both parent and child when a minor is removed from parental custody." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.) "Of course, the juvenile court's discretion in fashioning reunification orders is not unfettered. Its orders must be 'reasonable' and 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' (§ 362, subd. (c).) 'The reunification plan " 'must be appropriate for each family and be based on the unique facts relating to that family.' " [Citation.]' " (*Nolan W.,* at p. 1229; see *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172-173.) We review the propriety of court-ordered reunification services at this stage for abuse of discretion. (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311; see *Nolan W,* at p. 1229.)

The provisions of C.C.'s case plan requiring him to admit sexually abusing D.C. are reasonable. These provisions were recommended by the Agency social worker responsible for the minors. The juvenile court was well within its discretion to determine that the case plan, including the disputed provisions, was designed to eliminate the protective issues surrounding the minors—including C.C.'s repeated and violent sexual abuse of D.C. C.C. argues that the disputed provisions are "therapeutic exercises" that the Agency and juvenile court are unqualified to administer. His argument provides no basis for us to find an abuse of discretion in this case, however, where the Agency specifically recommended the disputed provisions. The Agency has both institutional experience (in itself) and individual experience (in its supervising social worker) with sexual abuse cases. Given the Agency's recommendation, and on the current record, we

20

cannot say the court's decision to include these provisions in C.C.'s case plan was unreasonable or an abuse of discretion.[6]  (See *In re Briana V., supra*, 236 Cal.App.4th at pp. 311-312.)

C.C. also contends the disputed provisions violate his constitutional rights against compelled self-incrimination.  It is well-settled, however, that C.C. automatically receives use immunity for statements made in court-ordered therapy:  "The California Constitution requires that a person proceeding simultaneously in the criminal courts for child abuse and the juvenile court regarding a dependency of the abused minor should not only be granted use immunity for his or her testimony at dependency proceedings that constitutes an admission to the acts at issue in the criminal case against him or her but also for such statements made during court-ordered therapy."  (*In re Jessica B.* (1989) 207 Cal.App.3d 504, 521; see *In re Lamonica H.* (1990) 220 Cal.App.3d 634, 650 ["[W]e find any admissions [father] makes during the course of treatment ordered as part of the reunification plan would be immune from use in criminal proceedings which might be brought against him."]; *In re Candida S.* (1992) 7 Cal.App.4th 1240, 1250.)  Based on this use immunity, a dispositional order requiring participation in therapy does not

6      In briefing this issue, both the Agency (in its respondent's brief) and C.C. (on reply) cite and rely on publications from the Center for Sex Offender Management, which the Agency contends is a project of the U.S. Department of Justice.  These publications appear to be cited for the first time on appeal, and their citation is unaccompanied by any request for judicial notice.  We are reluctant to find either that the Agency's opinion should be bolstered or impeached based on documents not considered by the juvenile court or tested at trial.  The proper venue for factual development on the reasonableness of the provisions of C.C.'s case plan, which might have included testimony and evidence surrounding the cited publications, was the juvenile court.

infringe a parent's right against compelled self-incrimination. (*Candida S.,* at p. 1250; *Lamonica H.,* at p. 650; *Jessica B.,* at p. 521.)

C.C. questions whether this immunity would apply to the list of triggers and letters of apology identified in the case objectives portion of his case plan. We conclude it does. As the Agency points out, C.C.'s case plan includes a single recommended service: sexual abuse therapy. The case objectives are to be completed as part of that therapy. Because use immunity applies to his "course of treatment ordered as part of the reunification plan" (*In re Lamonica H., supra*, 220 Cal.App.3d at p. 650), the immunity would apply to the identified case objectives as well. The juvenile court was not required to make an order specifically conferring use immunity in connection with C.C.'s case plan. (*Ibid.*; *In re Jessica B., supra*, 207 Cal.App.3d at p. 521; see *In re Candida S., supra*, 7 Cal.App.4th at pp. 1250-1251 [holding that the juvenile court is not required to inform parents of use immunity].) The court did not err by including the disputed provisions in C.C.'s case plan.

IV

C.C. also contends the court erred by limiting his educational rights to Ce.C. and F.C. "Parents have a constitutionally protected liberty interest in directing their children's education. [Citations.] However, when a child is a dependent child, a court may limit a parent's ability to make educational decisions on the child's behalf . . . ." (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276.) "In all cases in which a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may limit the control to be exercised over the dependent child by any

22

parent or guardian and shall by its order clearly and specifically set forth all those limitations. Any limitation on the right of the parent or guardian to make educational or developmental services decisions for the child shall be specifically addressed in the court order. The limitations may not exceed those necessary to protect the child." (§ 361, subd. (a)(1).) "We review the juvenile court's order limiting parents' educational rights under an abuse of discretion standard [citation], bearing in mind '[t]he focus of dependency proceedings is on the child, not the parent' [citation]." (*R.W.*, at p. 1277.)

Here, the evidence showed that C.C. called D.C.'s school multiple times and harassed school officials. The juvenile court was entitled to find C.C.'s behavior especially troubling given his statement he did not want a relationship with D.C. The juvenile court could reasonably have determined that an order limiting C.C.'s educational rights was necessary before he began to harass officials at Ce.C. and F.C.'s school as well. Just as in other areas of dependency law, the juvenile court need not wait until harm occurs before making orders to protect the minors. (Cf. *In re Cole C., supra*, 174 Cal.App.4th at p. 917.)

C.C. claims Ce.C. and F.C. will be harmed by his inability to participate in their educational decisions. The Agency counters that the juvenile court specifically ordered M.J. to share educational information with C.C. and ordered the Agency to determine whether C.C. could participate in some school activities. We do not reweigh this evidence bearing on the minors' best interests, however, and will not substitute our judgment for that of the juvenile court in this regard. On the evidence presented, the juvenile court was entitled to find that an order limiting C.C.'s educational rights was

necessary to protect the minors. C.C. has not shown the court abused its discretion in doing so.

V

M.J. challenges the court's finding that ICWA does not apply. She contends the court erred by not providing notice of the proceedings to the Indian tribes in which C.C. claimed potential membership or eligibility for membership. C.C. joins in this challenge as well.

As we have noted, M.J. and C.C. adopted the children following a prior dependency case with the Agency. The Agency informed the juvenile court that ICWA did not apply based on a finding to that effect in the minors' prior dependency case. The juvenile court found that ICWA did not apply in this dependency case as well, but it required C.C. to submit a "Parental Notification of Indian Status" form (ICWA-020) disclosing any Indian heritage. (M.J. had already submitted an ICWA-020 form claiming no Indian heritage.) C.C.'s form contained the following statement: "I am or may be a member of, or eligible for membership in, a federally recognized Indian tribe." His form listed the Cherokee Nation and an unspecified "Apache" tribe as the tribes in which C.C. claimed potential membership or eligibility for membership. C.C.'s form does not appear to have prompted any discussion or reconsideration of the ICWA finding in the juvenile court.

The policy statement underlying ICWA reads as follows: "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the

24

establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902; see *In re Junious M.* (1983) 144 Cal.App.3d 786, 789-790 [describing the background and goals of ICWA]; see also § 224, subd. (a).)

ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" (25 U.S.C. § 1903(4); see § 224.1, subd. (a).) "Tribal membership is treated under the ICWA as a matter of political affiliation rather than racial origin: 'The ICWA recognizes the political affiliation that follows from tribal membership in a federally recognized tribe, rather than a racial or ancestral Indian origin . . . .' " (*In re B.R.* (2009) 176 Cal.App.4th 773, 783 (*B.R.*).) Thus, "[t]he definition of 'Indian child' . . . does not by its own literal language require either that the child's biological parents be members of a tribe or that one of the child's biological parents have tribal ancestry." (*Ibid.*)

In proceedings that potentially involve an Indian child, ICWA requires notice on any affected Indian tribe: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention. . . ." (25 U.S.C. § 1912(a); see *In re Gerardo A.* (2004)

25

119 Cal.App.4th 988, 994; see also § 224.2, subds. (a), (b).) ICWA's notice requirement is a " 'key component of the congressional goal to protect and preserve Indian tribes and Indian families.' " (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) "[T]he tribe's right to assert jurisdiction over the proceeding or to intervene in it is meaningless if the tribe has no notice that the action is pending." (*In re Junious M., supra*, 144 Cal.App.3d at pp. 790-791.)

" 'The determination of a child's Indian status is up to the tribe; therefore, the juvenile court needs only a suggestion of Indian ancestry to trigger the notice requirement.' (*In re Nikki R.* (2003) 106 Cal.App.4th 844, 848 . . . ; [citation]; *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 258 . . . [providing exhaustive analysis of the issue and concluding the 'minimal showing' required to trigger notice under the ICWA is merely evidence 'suggest[ing]' the minor 'may' be an Indian].) 'Given the interests protected by the [ICWA], the recommendations of the [federal] guidelines, and the requirements of our court rules, the bar is indeed very low to trigger ICWA notice.' " (*In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165.)

The issue here is whether C.C.'s statement that he is or may be a member of an Indian tribe, or eligible for membership in an Indian tribe, was sufficient information to trigger the notice requirements of ICWA, i.e., whether it provided "reason to know that an Indian child is involved" under ICWA. (See 25 U.S.C. § 1912(a).) If C.C. were the minors' biological father, it is reasonably apparent ICWA notice would be required. (See § 224.3, subd. (b)(1); see also *In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1406 [holding "father's claim that his grandparents had Native American ancestry, and that

26

Antoinette therefore does as well, was sufficient to trigger the notice requirements of the Act"].) It appears no California case has directly considered whether such information provided by an adoptive father triggers the notice requirements of ICWA.

The Court of Appeal in *B.R.* considered whether a biological father's statement that his adoptive father (the dependent minors' parental grandfather) was one-fourth Apache Indian was sufficient to require ICWA notice. (*B.R., supra*, 176 Cal.App.4th at pp. 777, 778.) The trial court indicated that the social services agency would notify the Apache tribes "if required by law," but the agency did not do so. (*Id.* at pp. 778-779.) Other tribes were notified, but none appeared in the proceedings. (*Ibid.*) The trial court subsequently found ICWA did not apply. (*Id.* at p. 779.)

The Court of Appeal found error: "The trial court left it to the [social services agency] to determine whether the minors were Indian children for purposes of the ICWA, rather than letting the Apache tribes make that determination by ordering that notice be sent to the tribes. It is true that in this case the minors were not the biological children of a parent with Indian blood. They are the grandchildren by adoption of an ancestor with Indian blood. But the definition of 'Indian child' under the ICWA does not by its terms automatically exclude such children. To the contrary, the ICWA focuses on 'membership' rather than racial origins. It protects children who are 'members of or eligible for membership in' federally recognized Indian tribes. ([25 U.S.C.] § 1901(3).)" (*B.R., supra*, 176 Cal.App.4th at p. 783.) A child without biological Indian ancestry "could still be an 'Indian child' for purposes of the ICWA so long as either (1) the child is a member of an Indian tribe or (2) one of the child's biological parents is a member of the

27

tribe and the child is eligible for membership." (*Ibid.* [italics omitted].)  Because the father was "potentially a member of an Apache tribe via his adoptive relationship with the minor's grandfather," the minors may have been Indian children and therefore ICWA notice was required.  (*Id.* at p. 785.)

B.R. relied heavily on *In re M.C.P.* (Vt. 1989) 571 A.2d 627 (*M.C.P.*).  In *M.C.P.*, the Supreme Court of Vermont considered whether ICWA notice was required under facts similar in relevant respects to those presented here:  "[T]he juvenile's [adoptive] father, R.P., testified that he is Mohawk Indian and that his people were from the St. Regis Reservation in New York.  With respect to the juvenile, the father testified that while she is not currently a member of the Mohawk Tribe, she could be eligible for membership in the tribe."  (*Id.* at p. 632.)  The court agreed, on this evidence, the dependent child did not appear to be an Indian child because the child was neither (1) a member of an Indian tribe nor (2) eligible for membership in an Indian tribe and the *biological* child of a member of an Indian tribe.  (*Id.* at pp. 632-633; see 25 U.S.C. § 1903(4).)

The court explained, however, that this determination did not end the inquiry:  "The notice provision, 25 U.S.C. § 1912(a), applies not only when the trial court finds the juvenile is an Indian child but also when the court 'has reason to know that an Indian child is involved.'  This language reflects the fact that Indian tribes have an interest in Indian child welfare proceedings apart from the parties and that the information provided by the parties bearing on whether the juvenile is an Indian child may be incomplete.  It also reflects the fact that Indian tribes are in a better position to determine the

membership of individuals who have some relationship to the tribe and the court should defer to this expertise." (*M.C.P., supra*, 571 A.2d at p. 633, fn. omitted.)

The court determined the adoptive father's statement that he was a member of an Indian tribe was sufficient to trigger ICWA's notice provisions: "[W]e believe that the statute as interpreted in the Guidelines[7] requires that the trial court give notice to the Saint Regis Mohawk Indian Tribe. The father's membership in this tribe alone gives the trial court reason to know that the juvenile could be a member of the tribe and thus be an Indian child. Cf. Trentadue & DeMontigny, *The Indian Child Welfare Act of 1978: A Practitioner's Perspective*, 62 N.D.L.Rev. 487, 505 (1986) (some tribes 'extend membership to any descendent of a member regardless of Indian blood quantum'). Although the father testified that the juvenile was eligible for membership, but not a member, we cannot find that evidence to be conclusive. The tribe, not the father, is the arbiter of its membership and as the commentary to the guidelines states is the best source of information on whether the juvenile is a member. The father is not necessarily knowledgeable about tribal membership, and his interests may diverge from those of the tribe." (*M.C.P., supra*, 571 A.2d at p. 634.)

We find *B.R.* and *M.C.P.* persuasive and instructive on the facts here. As in those cases, we conclude ICWA notice was required even though the minors in this case have

---

7    Guidelines for State Courts; Indian Child Custody Proceedings (44 Fed.Reg. 67584 et seq. (Nov. 26, 1979) (Guidelines)). Among the circumstances under which a court has reason to believe a dependent minor is an Indian child is that "[a]ny public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child." (*Id.* at p. 67586.)

no biological Indian ancestry. C.C. informed the Agency that he is or may be a member of an Indian tribe, specifically the Cherokee Nation and an unspecified Apache tribe. On this record, C.C.'s disclosure was sufficient to trigger ICWA's notice requirement because it suggested that the minors may be members of an Indian tribe as well. (See 25 U.S.C. §§ 1903(4), 1912(a); see also *In re Gabriel G., supra*, 206 Cal.App.4th at p. 1165; *B.R., supra*, 176 Cal.App.4th at p. 783.) "The notice requirement applies even if the Indian status of the child is uncertain. [Citation.] The showing required to trigger the statutory notice provisions is minimal . . . . [Citation.] A hint may suffice for this minimal showing." (*In re Miguel E.* (2004) 120 Cal.App.4th 521, 549.) C.C.'s status as an adoptive father is not determinative. Nothing in the record or the parties' briefing indicates that these tribes categorically exclude adoptive children from membership. Indeed, according to the authority cited by the Supreme Court of Vermont, tribes may extend membership to children regardless of Indian blood quantum. (*M.C.P., supra*, 571 A.2d at p. 634; see *B.R., supra*, 176 Cal.App.4th at p. 785 [minor's father was "potentially a member of an Apache tribe via his adoptive relationship with the minor's grandfather"]; see also Guidelines, *supra*, 44 Fed.Reg. at p. 67586 ["It is the tribe's prerogative to determine membership criteria and to decide who meets those criteria."].)

Like *B.R.* and the Vermont Supreme Court in *M.C.P.*, we are mindful that failure to give notice renders the dependency proceedings (including any future termination of parental rights) vulnerable to collateral attack if the minors are in fact Indian children. (See 25 U.S.C. § 1914; *B.R., supra*, 176 Cal.App.4th at p. 784; *M.C.P., supra*, 571 A.2d at pp. 634-635.) "To maintain stability in placements of children in juvenile proceedings,

30

it is preferable to err on the side of giving notice and examining thoroughly whether the juvenile is an Indian child." (*M.C.P., supra*, 571 A.2d at pp. 634-635; see *B.R., supra*, 176 Cal.App.4th at p. 784.)

The Agency contends "the evidence reveals that [the minors] are not members of an Indian tribe, nor are they the biological children of a member of a tribe." But the Agency's position "fails to 'distinguish between a showing that may establish a child is an Indian child within the meaning of the ICWA and the minimal showing required to trigger the statutory notice provisions.' " (*In re Antoinette S., supra*, 104 Cal.App.4th at p. 1407.) "The conclusion, based on the evidence available, that the juvenile is not an Indian child does not . . . end the inquiry." (*M.C.P., supra*, 571 A.2d at p. 633.) The potential for ICWA notice must still be considered. The relevant question is not whether the evidence currently supports a finding that the minors are Indian children; it is whether the evidence triggers the notice requirement of ICWA so that the tribes themselves may make that determination. The Agency does not persuasively address that question.

The Agency primarily relies on *In re Francisco D.* (2014) 230 Cal.App.4th 73. In that case, the Court of Appeal affirmed the juvenile court's finding that ICWA did not apply. (*Id.* at p. 84.) *Francisco D.* focused on the ultimate question of whether ICWA applied, rather than whether notice was required: "[T]he evidence indicates that Francisco is not a member of an Indian tribe, nor is he the biological child of a member of a tribe. Thus, Francisco cannot satisfy the definition of an Indian child. Based on the plain language of the statute, ICWA is inapplicable to his dependency case, regardless of adoptive Mother's own Indian tribal membership." (*Id.* at pp. 83-84.) The court

31

addressed notice only in passing: "Mother asserts that investigation into Francisco's Indian heritage and an ICWA-compliant notice were required because 'it appears from the record that [Mother] may have a biological relationship with Francisco.' Yet, Mother fails to direct us to anywhere in the record indicating that she is biologically related to Francisco. [Citations.] Moreover, based on our review of the record, there is no evidence to support this contention." (*Id.* at p. 84.) Here, the notice requirement is not based on any purported biological relationship between C.C. and the minors; it is based on C.C.'s adoptive relationship. *Francisco D.* did not consider whether notice would be required under such a circumstance. "[I]t is axiomatic that cases are not authority for propositions not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.) The Agency's reliance on *Francisco D.* is unavailing.

The other cases cited by the Agency are similarly inapplicable. *In re Jose C.* (2007) 155 Cal.App.4th 844 explicitly did not consider notice: "The question here does not involve notice because the [Indian tribe] was properly noticed and responded." (*Id.* at p. 849.) *In re E.G.* (2009) 170 Cal.App.4th 1530, 1533 considered notice based on a claim of Indian ancestry by an alleged father later excluded as the dependent minor's biological father. *In re E.G.* found notice unnecessary based on that exclusion. (*Ibid.*) Here, C.C. was not a mere alleged father; he was the minors' adoptive father. And, "[t]o the extent *E.G.* suggests in dictum that no ICWA notice is ever required unless the minor is shown to potentially have Indian blood, we respectfully disagree with it." (*B.R., supra*, 176 Cal.App.4th at p. 785, fn. omitted; see *In re Hunter W.* (2011) 200 Cal.App.4th 1454,

32

1469 ["[T]he court erred by stating that ICWA did not apply to this case because [the minor] may not be biologically related to his maternal grandfather of Indian ancestry."].)

Because the juvenile court did not provide ICWA notice, we vacate the juvenile court's ICWA findings and remand for proper notice. We decline to reverse the jurisdictional and dispositional orders because there is not yet a sufficient showing that the minors are Indian children. (See *In re Hunter W., supra*, 200 Cal.App.4th at p. 1467.) If the minors are determined to be Indian children, an interested party may petition the court to invalidate any orders shown to have violated ICWA. (25 U.S.C. § 1914; *In re Damian C.* (2009) 178 Cal.App.4th 192, 199-200.)

## DISPOSITION

The juvenile court's orders finding ICWA inapplicable to these dependency proceedings are vacated. In all other respects, the challenged orders are affirmed. The matter is remanded to the juvenile court with directions to require the Agency to provide proper ICWA notice, to determine the applicability of ICWA based on that notice and any further inquiry, and for further proceedings consistent with this opinion.

McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

PRAGER, J.[*]

---

[*]    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/17/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.C. et al., Persons Coming Under the Juvenile Court Law. | |
| | D068146 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519166A-C) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| M.J. et al., | |
| Defendants and Appellants. | |

THE COURT:

The opinion in this case filed December 4, 2015, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties