Filed 1/4/22  In re N.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076870 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J286376 & J286377) |
| v. | OPINION |
| J.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, Joseph R. Barrell, Deputy County Counsel for Plaintiff and Respondent.

1

J.M. (Father) and C.M. (Mother; collectively, Parents)[1] are the parents of twins E.M. (male) and N.M. (female), born in May 2020 (collectively, the children). When the children were approximately three months old, they were removed from Parents care. Father appeals from the juvenile court's order (1) removing the children from Father's custody; (2) denying reunification services to Father; and (3) requiring visitation between the children and Father to be supervised. For the reasons set forth *post*, we affirm the trial court's findings and orders.

## FACTUAL AND PROCEDURAL HISTORY

### A. THE INITIAL INVESTIGATION

On August 22, 2020, San Bernardino County Children and Family Services (CFS) received an immediate response referral alleging severe and general neglect of three-month-old E.M. The child had been taken to Loma Linda University Medical Center (Loma Linda) where the staff discovered that he had a displaced fracture of his right humerus.

When Mother was interviewed by the social worker the next day, Mother stated that she was watching E.M. with her friend, G.F. (Friend) when she noticed that E.M. was not as active as usual, and not moving his arm normally. Mother immediately contacted the nurse advice line; the nurse advised Mother to take E.M. to the emergency room. Neither Mother nor Friend had an explanation for E.M.'s injury. Mother had been keeping her distance due to health issues.

---

[1] Mother is not a party to this appeal.

Father also noticed that E.M. was not moving his arm but also did not have an explanation even though he was home with the children because he was unemployed.

The social worker examined N.M., and found her to be in good health. The social worker requested that N.M. have a skeletal survey and forensic exam.

Mother later contacted the social worker and told the social worker that on the morning of August 22, 2020, she had E.M. in a "mobi wrap carrier," and this may have been how he sustained the fracture. Mother also stated that Father may have caused the injury when he tried to stop E.M. from slipping through Father's legs. Mother did not explain why she did not provide this information during the initial interview.

A nurse reported that E.M.'s injury was highly suspicious of abuse because E.M. was nonambulatory and unlikely to sustain an injury of that nature. The hospital was conducting a nonaccidental trauma work-up.

On August 23, 2020, CFS issued a detention warrant. The children were detained in the relative home of maternal aunt, Mrs. L. (Aunt) the same day.

B.       SECTION 300 PETITION AND DETENTION HEARING

On August 25, 2020, CFS filed Welfare and Institutions Code[2] section 300 petitions on behalf of both children. As to E.M., the petition alleged that he was at risk of suffering or had suffered serious physical harm inflicted nonaccidentally pursuant to section 300, subdivision (a), and that Parents failed to protect him pursuant to section

---

[2]  All further statutory references are to the Welfare and Institutions Code unless specified otherwise.

3

300, subdivision (b). As to N.M., the petition alleged substantial risk of abuse or neglect pursuant to section 300, subdivision (j), as a result of the injury to her twin, E.M.

On August 26, 2020, at the detention hearing, Parents appeared telephonically and denied the allegations. Father was assisted by a Spanish language interpreter. The court read and considered the detention report dated August 26, 2020, and found that there was a prima facie basis to detain the children from Parents. The court ordered predispositional services and visitation one time a week for two hours for Parents. The court then set a jurisdiction/disposition hearing on September 16, 2020. The children remained with Aunt.

C.      JURISDICTION AND DISPOSITION REPORTS

On September 12, 2020, CFS filed a jurisdiction/disposition report. In the report, CFS requested a continuance for medical and law enforcement reports necessary to complete its investigation. Parental interviews were conducted and provided in the report.

On September 4, 2020, the social worker interviewed Father. Father stated that he, Mother, and Friend all resided in the home and shared childcare duties. During the interview, Father was tearful and claimed that the injury was unintentional. He said that he was taking care of E.M. because E.M. was fussy and Mother was not feeling well. Father stated that he was rocking E.M. on his knees when E.M. jerked and almost fell out of Father's hands. Father grabbed E.M. under his arm and turned him to face in his direction. Father stated that he may have grabbed E.M. "hard" and hurt his arm. Father stated that E.M. did not usually cry a lot but he had been crying a lot earlier in the

4

morning. Father stated that a couple of hours after the incident, Mother woke up and began to care for the children. Two hours later, Mother showed Father E.M.'s "wobbly" arm and took him to the hospital. Father did not observe any sign of injury and E.M. was not crying. Father had not informed Mother that he almost dropped E.M. that morning. When Mother left, Father and Aunt stayed to watch N.M.

Father told the social worker that when he was interviewed by law enforcement, he admitted to things he had not done. The officers told Father that if he admitted to breaking E.M.'s arm, the children could go home to Mother. He told the officers that he put pressure when folding E.M.'s arm, and could have caused the injury.

Father denied intentionally harming E.M. and said that it was unlikely Friend would harm the child either. Father initially claimed that Friend had moved to Los Angeles because they no longer needed assistance with caring for the children. Father, however, later revealed that Friend had moved in with Aunt. The social worker told Aunt that the arrangement with Friend was inappropriate; Friend was asked to leave the residence.

On September 8, 2020, the social worker interviewed Mother. She was tearful, and at times, inconsolable. She regretted not being able to provide an explanation of the injury at the time of removal. Mother stated that she, father, Friend, and Aunt were at the home on August 21 through August 22, 2020. Around 5 p.m. on August 22, Friend noted that E.M.'s arm was "floppy" and that he could not keep the arm lifted. Mother called the nurse advice line and took the child to the emergency room. Mother did not "consult" with Father about the injury. She told him that she was taking E.M. to the hospital. Law

5

enforcement interviewed Parents. After the interviews, Mother learned that Father admitted he had hurt E.M. Mother was not aware of Father's admission at the time of the initial interview. Mother told the social worker as soon as she found out. Mother was shocked and in disbelief. She did not think that Father would have intentionally hurt E.M.

The social worker concluded that the children were still at risk in Parents' care because Father admitted to causing the injury, and then recanted; thereby, not taking responsibility for his actions. Mother lacked protective capacity. After Mother learned about Father's confession, she bailed him out of jail believing the injury was an accident. Moreover, Parents were not forthcoming and failed to provide information to CFS.

At the jurisdiction and disposition hearing on September 16, 2020, the juvenile court granted CFS's request for a continuance for receipt of the police and medical reports. The matter was set for a further hearing on October 27, 2020.

On October 26, 2020, CFS filed an addendum report for the jurisdiction/disposition hearing. The report recommended that the allegations be found true, that reunification services be provided to Mother, and that no reunification services be provided to Father under section 361.5, subdivision (b)(6). The addendum report summarized the law enforcement and medical records. The requested medical and law enforcement documents were also provided.

During an interview with the social worker on October 9, 2020, Father denied he injured E.M. and claimed he was " 'psychologically pressured' " by law enforcement to admit that Father hurt E.M. Father claimed much of the interview was misunderstood

6

due to the language barrier. Deputy Maldonado translated the interview. Father claimed that he did not know much about the legal system and just " 'wanted everything to be over.' " When asked if he was recanting his confession to law enforcement, Father answered: " 'well if you guys are such good investigators shouldn't you know.' " Father asked about an interview of Friend, although he had previously expressed no concern about her and had moved in with her earlier in the case. Father claimed to be trying to " 'figure out how this happened.' "

Mother told the social worker that she was enrolled in parenting classes and attended two therapy sessions. She stated that she and Father were living separately. She did not know if the injury was intentional or accidental, but she also did not believe that Father would intentionally hurt E.M. Nonetheless, Mother assured the social worker her priority was the children.

The social worker reported that Parents were engaged in services. The social worker, however, recommended that services not be provided to Father because of the severity of E.M.'s injury and Father's failure to take responsibility. The social worker recommended that services be provided to Mother. Although Mother questioned whether the injury was nonaccidental, she had moved out of the home and was engaged in services.

### 1. *LAW ENFORCEMENT DOCUMENTS*

The law enforcement documents included numerous police reports from the San Bernardino County Sheriff's Department. On August 23, 2020, law enforcement conducted several interviews regarding the events on August 21 and 22, 2020.

7

The nurse assigned to care for E.M. at Loma Linda stated that "the mechanism to cause the injury was from pressure and bending," not from swaddling or a fall. She opined that the injury likely occurred between August 21 and 22, 2020.

Aunt stated that she stayed at the home to help Mother care for the children because Mother had Covid-19 symptoms, and Father had shingles. When Aunt arrived at the home on August 21, 2020, at approximately 5 p.m., E.M. appeared to be in "normal condition." On the 22nd, Aunt and Friend both woke up around noon. At approximately 4:30 p.m., Aunt stated that Friend noticed E.M.'s right arm was weak and limp. Friend told Mother; Mother called the pediatrician. Mother took E.M. to urgent care. Personnel at urgent care told Mother to take the child to Loma Linda. Aunt did not see anyone mishandle, drop, or strike the child. She did know how he got injured.

In Mother's interview, she confirmed that Father and Friend resided in the home, and Aunt came to assist them on August 21, 2020. E.M. appeared to be in good health on the night of August 21, and through all of the feedings and diaper changes that night. Mother stated that on August 22 she and Father took care of the children while Aunt and Friend slept. Mother took E.M. out of his crib from 10 to 10:30 a.m. thereafter, she took a nap until Aunt and Friend got up between noon and 1:00 p.m. Several hours later, Father fed E.M. and Friend fed N.M. Mother stated that Father usually "gives up" feeding the children, which happened on August 22. Therefore, Friend finished feeding N.M. When she was laying him down, she noticed that the child's arm was limp. Friend told Mother about the arm. Mother called a nurse who advised her to take E.M. to Loma Linda. At Loma Linda, she found out that E.M. had a broken arm. At that time, E.M. did

8

not appear to be in distress. While at the hospital, Father told Mother that he grabbed E.M. by the arm to prevent him from falling during one of the feedings. Mother was not present when this occurred.

Father stated that he fed E.M. between noon and 1:00 p.m. by himself in the living room. Mother was in the bedroom with N.M.; Aunt and Friend were asleep in another bedroom. While Father was feeding E.M., the child began to fall from Father's lap. Father grabbed E.M. by the arm to keep him from slipping. E.M. did not cry or appear to be in pain. At about 5 p.m., Friend noticed that E.M.'s arm was limp. Mother eventually took the child to the hospital. Father was willing and presented himself at Sheriff's headquarters to take a polygraph test but was unable to because he had shingles.

Friend confirmed that she lived in the home with Parents and assisted them with the care of the children. She did not notice anything out of the ordinary when caring for the children on August 19, 20 and 21. On the 22nd, Friend woke up at 8 a.m. She went back to sleep and woke up at noon. Friend saw Father playing with N.M. and Mother playing with E.M. Friend then fed N.M. and Father fed E.M. Because Father had a hard time feeding E.M., she finished the feeding. She played with E.M. for 10 to 15 minutes then he became fussy. She noticed that his arm was "wobbly and elastic." She also noticed that when she moved E.M.'s arm, it "rolled down." E.M. was asleep and did not cry. Later, when he became fussy again, Mother and Friend could not find any injuries on E.M. Mother, however, called the doctor's office. Friend did not hear E.M. cry but she heard Father tell Mother that he grabbed E.M.'s arm as he slipped. Father was not sure if that caused the injury.

9

In Father's second interview with law enforcement, Father stated that he did not notice any injuries to E.M. August 21 through August 22. At about 12 p.m., E.M. woke up and Mother brought him to Father. She then went back to bed. Father described the child as "restless and fussy." Father put E.M. on his thigh with the child's legs between his thighs. E.M. began to fall so Father lifted him up to chest level with Father's hands underneath the child's armpits. E.M. continued to cry and Father became frustrated. Father grabbed and pried on E.M.'s arm and pulled the arm down toward his own thigh. Father said that when he laid E.M. down on Father's lap, E.M. was crying loudly. After about nine minutes of crying, Mother came into the room to help sooth E.M. Father did not tell Mother about what happened because he was scared. He admitted being frustrated and did not think he could hurt E.M.

Father was placed under arrest for willful cruelty to a child under Penal Code section 273a, subdivision (a).

2. *MEDICAL RECORDS*

On August 23, 2020, E.M.'s medical evaluation was suspicious of physical abuse but more information was needed. E.M. had a "minimally displaced fracture of the right mid humerus diaphysis." No other fractures were noted. The CT findings were normal and no intracranial hemorrhage was found. The preliminary findings were "highly suspicious for inflicted injury" because E.M. was a "very young, non-mobile infant with an unexplained fracture of his mid right humeral shaft" and no history of trauma was provided to explain the injury.

10

N.M.'s medical report did not reveal any "cutaneous injuries" and the skeletal survey, head CT, and trauma labs were all normal. However, "the absence [of] injuries does not preclude the possibility of prior physical abuse."

D.     JURISDICTION AND DISPOSITION HEARINGS

The October 27, 2020, jurisdictional and disposition hearing was continued to November 20, 2020. Thereafter, the hearing was continued again to December 15, 2020. Because Father was not prepared to proceed on December 15, the hearing was continued to January 26, 2021.

On January 26, 2021, an additional information to the court was filed. The report stated that Mother completed eight individual therapy sessions. Her therapist indicated Mother identified that she "mishandled the situation at first and what she needs to do moving forward to keep her children safe." The therapist's report was attached and included a positive prognosis. The additional information to the court also included mother's completion documents for parenting and parent management. Moreover, Mother told the social worker that she did not intend to return to Father because he is the suspected perpetrator in this case. Mother's visits were increased to overnight, once a week. CFS requested authority to return the children to Mother by packet.

Father completed 12 parenting classes and eight individual counseling sessions. Father, however, denied E.M.'s arm was broken while in Father's care. Father accepted that it was a mistake not to inform Mother. He, however, denied that he caused the injury because E.M. was not upset. The Child Abuse Prevention and Treatment Services reports

indicated a positive prognosis for Father, but also indicated that Father had not taken responsibility for the injury and recanted his previous statements.

The children continued to do well in the care of Aunt. CFS continued to recommend reunification services for Mother and no reunification services for Father.

At the January 26, 2021, jurisdiction and disposition hearing, the juvenile court found (1) the amended section 300, subdivision (j)(1), allegation on N.M.'s petition to be true; (2) the amended section 300, subdivision (a)(1), and (b)(3), allegations true on E.M.'s petition; and (3) dismissed the section 300, subdivision (b)(2), allegation on E.M.'s petition. The court then set the matter for a contested disposition hearing on February 9, 20201. The court authorized CFS to expand Mother's visitation beyond one overnight a week.

At the contested disposition hearing on February 9, 2021, the court continued the hearing to March 10, 2021.

On March 9, 2021, CFS filed an addendum report. The social worker recommended the children be returned to Mother's custody with in-home court-ordered supervision. CFS continued to recommend that Father receive no reunification services.

Dr. Velasquez's report and CV were attached to the addendum; she was stipulated to be an expert witness at the hearing. Her report dated February 24, 2021, included a clinical interview and the administration of psychological testing. She was provided with the jurisdiction and disposition report from September 16, 2020, and law enforcement report from August 27, 2020. Father reported to Dr. Velasquez that he did not think he hurt E.M., but was uncertain now. Father accepted that his son was hurt but that it was an

12

"indiscretion, a mistake," and he would never hurt his children. Father presented himself in an overly positive light, which the doctor deemed appropriate given the child custody issues. Dr. Velasquez concluded that Father would benefit from family reunification services; Father had completed parenting classes and this along with his emotional functioning would ensure his children would not be at risk of future harm. Dr. Velasquez stated that Father had the "psychological resources" to learn from his past behaviors. She did not have concern for the safety of the children and believed that Father would benefit from family reunification services.

The social worker interviewed Father about the psychological evaluation. Father expressed that he believed he was entitled to an opportunity to reunify because he had been compliant with all of CFS's requests. Father stated that he was remorseful and what occurred was "an accident and never intentional." Father said he is "big and strong" and may have caused the break "accidentally." He maintained that he was coerced into admitting that he hurt his son so the children could then be returned to Mother.

The social worker interviewed Parents about their relationship. Father said that marriage is forever and that he would like to reconcile with Mother but he had hardly talked with her. Mother stated that in her religion, marriage is forever and that no one in her family had ever been divorced. She, however, stated that " 'There is a first time for everything.' " On February 25, 2021, Mother provided an email exchange with her property manager, which showed that she no longer shared a lease with Father. On March 5, 2021, the social worker made an unannounced visit to the home. Mother was

13

not present but the home appeared appropriate. Later that day, Mother informed the social worker that she was filing for divorce.

At the hearing, the juvenile court accepted the March 9, 2021, addendum report, Dr. Velasquez's report and CV, and considered all previous reports entered into evidence at the jurisdiction hearing. Dr. Velasquez was then called to testify.

1. *TESTIMONY OF DR. VELAZQUEZ*

On direct examination, Dr. Velazquez testified that Father does not have a diagnosable mental disorder. She stated that he tended to show himself in a positive light, which was acceptable given the circumstances. She reenacted what Father claimed he did the day E.M.'s arm was broken. She described father as "distraught" during his reenactment. She testified that Father said, "I never ever wanted to hurt my children or my son . . . his arm was broken . . . I was taking care of him, so it had to be my fault. I feel so responsible for this. I need to learn what I can do different." Dr. Velazquez testified that, in her opinion, Father had the psychological, emotional, and intellectual capacity to learn from this incident. She stated that Father had no history of violence and opined that a lack of past violence indicates that there will not be future violence. Dr. Velasquez opined that Father would benefit from family reunification services. She recommended parenting classes, family therapy with Mother, and individual therapy.

The children's counsel cross-examined Dr. Velazquez. When asked about the discrepancy between the statements Father made to her and the statements he made to law enforcement, Dr. Velazquez responded that when Father spoke to law enforcement, he was scared of what they would think and of what Mother would think. Therefore,

14

Father told them what he thought they wanted to hear. When Father spoke with her, however, he told her what he remembered, without being scared.

On cross-examination by county counsel, Dr. Velazquez attempted to explain what Father had stated to her. She said it was difficult to convey what Father had stated in English because they spoke Spanish in the interview. Dr. Velasquez stated that Father was "frustrated," and "it's not that he felt frustrated at [E.M.], but [Father] was frustrated he couldn't comfort [E.M.] and have him stop—to keep him from being fussy." She went on and stated: "So [Father] was trying to do everything he knew how to comfort his child; everything he knew how to do it. He even said to me, 'I was a new father. I did not really know how to comfort him as a mother does.' His wife. 'And I was trying everything I could to try to help because my wife hadn't slept. And I was trying to get— make sure that she was okay and I was trying to comfort him.' So that's what he said."

County counsel then asked—"So after reading all the reports and knowing that the forensic doctors find that this injury—this broken arm to this three-month old is highly suspicious for inflicted trauma, it's still your opinion that you have absolutely no concerns for the safety of his children?" Dr. Velasquez responded, "I do not."

On redirect and recross by Mother's counsel, Dr. Velazquez opined that Father did not have the intent to abuse E.M., and did not take out his frustration or anger on him.

During closing argument, Father's counsel argued that Father did not intend to cause harm to E.M., and "he's still somebody that owns up to it, that wants to get better that has taken responsibility for it." Counsel cited to Dr. Velazquez's opinion that Father

15

could benefit from services and claimed that the children would benefit greatly having him in their life.

Mother's counsel focused on the discrepancies in Father's stories about what had occurred. Counsel argued that the evidence showed Father "intentionally broke the child's arm" and that the "(b)(6) bypass is appropriate."

County counsel joined with the children's counsel and stated that Father was telling people "what he wants to be true" and "has a problem with being consistently honest about facts." His statements to the police were very specific and different from what he told Dr. Velazquez. Counsel also found the explanation given to Dr. Velazquez to be illogical—that as the child fell, Father let go of the child's torso with one hand and grabbed the child's hand/arm. As for the doctor's opinion, county counsel noted that it is only one of the factors relevant to a section 361.5, subdivision (b)(6) bypass. Counsel further argued that Father was "backtracking" in taking responsibility and that he has not made progress despite getting predispositional services.

The juvenile court found Father to be the children's presumed father and that ICWA did not apply. As for the factors under section 361.5, subdivision (b)(6), the juvenile court stated: "I am not [going] to offer services to [Father] unless there is clear and convincing evidence that reunification is in the best interest of the children. And I'm to take into account some specific factors to include a specific act or omission comprising the severe physical harm, the circumstances under which it was inflicted, the severity of emotional trauma suffered by the child, the history of abuse of other children, likelihood that the children may be returned within 12 months with no supervision, and the child's

16

desire to be reunified. The court noted that the children are obviously "too young to express any opinion and I have no history of abuse of any other children. [¶] Because of the age of the child, the severity of emotional trauma is also really unknowable if there is any."

As to the other three factors, the juvenile court found that the case was not "about intent. . . . [¶] Specific intent in this case is not what we're looking for. I don't believe that [Father] intended to hurt the child. But he did an intentional act which hurt the child." The court went on and noted that it believed that Father's "description to the police [was] the more accurate statement of how this happened. It wasn't just an accident; it was an intentional act that he did to this child who was three months old at the time, which resulted in the fracture. [¶] I believe [Father's] statement that he was frustrated and I think that's something that we can all understand how having two twins, a three month old, and crying and getting little sleep would lead to frustration." The court then went on and noted that Father "backslid" from that admission, probably because of the pending criminal case. However, the court stated that if the incident was an accident, Father should have been forthcoming. Therefore, the court believed "that the statement to the police is far more credible and explains the injury which is in line with what the medical forensic doctors believe."

The court concluded that there was not a substantial likelihood that the children would be returned to Father in 12 months without continuing supervision. The court found the factors under section 361.5, subdivision (b)(6), bypass had been proven "and also based on the fact that the children are going to be in the care of the mother, services

17

would be discretionary at this point even if [the court] did not bypass [Father]." The court then ordered visits at two times a month, supervised, for Father, and set a semi-annual review hearing on September 10, 2021.

On April 9, 2021, Father filed a notice of appeal from the findings and orders made at the contested disposition hearing on March 10, 2021.

## DISCUSSION

A.   THE COURT'S ORDER REMOVING THE CHILDREN FROM FATHER IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Father contends that "the juvenile court erroneously removed the children from Father's custody at disposition."

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶]  (1) [That] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody."  (§ 361, subd. (c).)

"Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures."  (*In re Kiesha E.* (1993) 6 Cal.4th 68, 76.)  California law therefore "requires that there be no lesser alternative before a child may be removed from the home of his or her parent."  (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 284; § 361, subd.

18

(c)(1).)  But, " ' "[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child." [Citation.]  The court may consider a parent's past conduct as well as present circumstances.' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1125.)

We review a juvenile court's dispositional order removing a child from parental custody for substantial evidence, " 'bearing in mind the heightened burden of proof.' " (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.)  "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 695.)  Still, the appellant bears the burden of showing " 'there is no evidence of a sufficiently substantial nature' " to support the dispositional removal order.  (*In re D.C.* (2015) 243 Cal.App.4th 41, 55, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.)

In this case, it is undisputed that Father did not challenge the jurisdictional finding of the juvenile court that while E.M. was in Father's care, E.M. suffered a displaced humerus fracture to his right arm, consistent with inflicted nonaccidental trauma, which placed both E.M. and N.M. at risk.  The injury was caused by an intentional act done out of frustration.  The juvenile court concluded that Father intended to commit the act that caused the broken arm.

With the facts mentioned above in mind, we find that substantial evidence shows that removing the children from Father's custody was necessary to protect the children's physical, developmental, and emotional well-being, and there were no other reasonable

means by which the children's well-being could be protected without removing them from Father's custody. (§ 361, subd. (c)(2).)

Here, when interviewed by law enforcement shortly after the injury to E.M. occurred, Father described prying and pulling on E.M.'s arm to the officers. E.M. cried for approximately nine minutes afterwards. Father informed law enforcement that he did not tell Mother because he was scared. Father eventually told Mother. She informed the social worker that Father told Mother that he may have injured E.M. when Father had the child's torso between his legs. The juvenile court found this version of events credible.

The evidence in this case showed that Father was not forthcoming and provided multiple versions of the events, often contradictory, that caused E.M.'s broken arm. Although he initially admitted prying and pulling E.M.'s arm, on September 4, 2020, Father told the social worker that the injury was an accident and "adamantly denied he intentionally harmed [E.M.]." Again, Father stated that he may have grabbed E.M. hard, but he did not cry a lot. Father went on to explain that although in the law enforcement interview he admitted breaking E.M.'s arm, he did not do it. Father stated that he may have said he "put pressure when folding the child's arm." About a month later, Father claimed that he was "psychologically pressured" by the detectives and there was a language barrier even though an officer who spoke Spanish was present during the interview. Then, in his therapy report from December 1, 2020, the therapist noted that Father told her he did not hurt E.M., he did not know how the child broke his arm, and the child was not upset when Father put the child in his crib. Father also told the social worker in an interview on February 12, 2021, and Dr. Velasquez during his evaluation,

20

that the child's injury was an accident, not intentional. Father never took full responsibility for his actions.

Moreover, Father's participation in predispositional services did not ameliorate the risk to the children. Before, during, and after completion of his services, Father changed his version of events on several occasions. Father has not fully engaged in voluntary services. Moreover, he continues to minimize what occurred and has failed to take responsibility for his actions, even while participating in services.

Based on the above, we find substantial evidence supports the dependency court's finding that there was a substantial risk to the children and no reasonable means to protect them under section 361., subdivision (c)(1), without the removal from Father's custody.

Notwithstanding, in support of his claim that the juvenile court erred in removing the children, Father relies on *In re Steve W.* (1990) 217 Cal.App.3d 10. *Steve W.* involved an order removing an infant from the mother's care after the father had been convicted of killing an older child. (*Id.* at pp. 12-15.) The mother testified she had no intent of resuming her relationship with the father. (*Id.* at p. 15.) The appellate court found the juvenile court's removal order had been improperly based on "speculation" that the mother "would enter a new relationship with yet another abusive type of person." (*Id.* at pp. 16, 22.) In *Steve W.*, however, the mother, though aware of the older child's injuries, had received an explanation for the injuries that a doctor testified would have been believable to an untrained person. (*Id.* at p. 21.) Moreover, the infant in *Steve W.* had not been abused himself, and the mother was not guilty of harming the infant.

21

Unlike the mother in *Steve W.*, here, Father caused the injury to E.M.  The risk to the children was not speculative.  After father caused serious physical injury to E.M. out of frustration, he did not call the doctor or alert Mother.  He did not take the child to the hospital.  He was not forthcoming with the investigators, his wife, or Dr. Velasquez about the events that led to E.M.'s injury.  Therefore, we find Father's reliance on *Steve W.* to be unpersuasive.

B.  THE JUVENILE COURT PROPERLY DENIED REUNIFICATION SERVICES TO FATHER

Father contends that "the juvenile court erred when it denied Father reunification services pursuant to section 361.5, subdivisions (b)(6) and (c)."

Under section 361.5, subdivision (a), "whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians."  (§361.1, subd. (a).)  For purposes of section 361.5, child welfare services may include both reunification and maintenance services.  (*In re Pedro Z., Jr.* (2010) 190 Cal.App.4th 12, 19 (*Pedro Z.*).)  Under section 361.5, subdivision (b), the juvenile court may deny reunification services in certain enumerated circumstances to those who would otherwise be entitled to receive them.

However, when a child is not removed from his or her custodial parent in the dependency proceeding, "no 'reunification' services are called for."  (*In re A.L.* (2010) 188 Cal.App.4th 138, 145.)  Instead, the court, in its discretion, may order services aimed

"to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d).)

In this case, the children were removed from Father and maintained with Mother with family maintenance services. Prior to the dependency, both parents were custodial parents. The children, therefore, are not in out-of-home care. They remain in the home of Mother, who was previously a custodial parent. Therefore, Father is not entitled to reunification services under section 361.5.

Under section 362, the juvenile court could choose to order services for the non-custodial parent. These services are commonly referred to in dependency as "enhancement services" (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 212); they are not the same as reunification services. Enhancement services are a form of discretionary " 'child welfare services offered to the parent not retaining custody, designed to enhance the child's relationship with that parent.' " (*Id.* at p. 212.) Unlike reunification services, enhancement services are " " 'not designed to reunify the child with that parent, but instead to enhance the child's relationship with that parent by requiring that parent to address the issues that brought the child before the court.' " ' " (*Id.* at pp. 212-213.) Unlike reunification services, enhancement services are not subject to strict timelines, periodic review, or mandatory extensions. (Compare § 362 with §§ 361.5 & 366.21, subd. (g)(1).) And unlike reunification services, which are mandatory and must be reasonable, enhancement services are wholly discretionary. (*In re Destiny D.*, at p. 213.) We therefore affirm an order on enhancement services unless the appellant demonstrates the order "was arbitrary, capricious or patently absurd." (*Ibid.*) Here, we find that the

court's denial was not arbitrary, capricious or patently absurd based on the facts described in detail *ante* regarding Father's involvement in injuring E.M.  Therefore, we discern no abuse of discretion.

C.    THE JUVENILE COURT PROPERLY ORDERED THAT VISITATION BE MONITORED

Father contends that the juvenile court erred in "unjustifiably, restrict[ing] Father and his  children to supervised visitation."  We disagree and affirm the court's visitation order.

We review a juvenile court's visitation orders for abuse of discretion.  (*In re Julie M.* (1999) 69 Cal.App.4th 41, 48-51.)  A juvenile court is given wide discretion in determining the appropriate terms and conditions of visitation between dependent children and their parents.  (*In re Megan B.* (1991) 235 Cal.App.3d 942, 953.)  Visitation orders should include frequency and duration, and the court cannot delegate whether visits will occur to the social services agency, child, or therapist.  (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757; *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237; *In re Julie M.*, *supra*, 69 Cal.App.4th at pp. 48-49; *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1477-1478.)

Under the abuse of discretion standard of review, we discern that the court's visitation orders did not exceed the bounds of reason.  Here, the supervision of visitation between Father and the children is more than justified given the severity of the injury to E.M., and the lack of progress Father has made, as provided in detail *ante*.  Additionally, given the facts of this case, the court may very well have abused its discretion if it

24

ordered visitation to be unsupervised.  Therefore, we find Father's contention to be without merit.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.