Filed 3/15/22  In re A.A. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re A.A. et al., Persons Coming Under the Juvenile Court Law. | B313338 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> AMBER W., <br><br> Defendant and Appellant. | Los Angeles County Super. Ct. No. 21LJJP00154A–C |

APPEAL from orders of the Superior Court of Los Angeles County, Stephanie Davis, Judge Pro Tempore. Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel for Plaintiff and Respondent.

# INTRODUCTION

Amber W. (mother) appeals from the juvenile court's jurisdiction findings and disposition orders declaring her three daughters dependents of the court and removing her eldest daughter, A.A., from her custody. Mother contends insufficient evidence supports the court's jurisdiction findings that she physically and emotionally abused A.A. or neglected her mental health issues. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    The Initiation of Dependency Proceedings

Mother and B.A. (father) have three daughters, A.A. (born in 2007), Bri. (born in 2009), and Bra. (born in 2011). Mother had sole physical and legal custody of the children after the parents separated several years ago.

Before the incident leading to this case, A.A. was diagnosed with depression and often exhibited aggressive behavior. She was prescribed Lexapro, which she hadn't taken for about three weeks before she was detained. She entered a therapy program around March 2020, which she completed. A.A. started a new therapy program later that year but stopped attending because her therapist moved and mother never sought additional services for her.

In March 2021, the family came to the attention of the Department of Children and Family Services (Department). One evening, mother and A.A. got into an argument because the child wouldn't follow mother's directions. During the argument, mother hit A.A. three times on the buttocks with a perforated wooden paddle. When A.A. started to walk away, mother threw the paddle at A.A., hitting the child's lower back. A.A. then grabbed

the paddle, and mother started chasing her. When A.A. gave the paddle back, mother struck her with it on the left torso.

Mother left the room for a while before returning with a four-inch poking device attached to a key chain, which the children described as a device used for "self-defense." Mother walked up to A.A. and poked the child in her chest with the device. Mother left the room again before returning with the paddle, which she threw at A.A., hitting the child in the torso. A.A. grabbed the paddle and ran up to her room. When mother tried to enter the room, A.A. hit her with it three times. The child eventually calmed down and mother left her alone for a while.

Later that evening, mother told A.A. that she had to sleep in the garage because of the way she had behaved. Mother kicked A.A. out of the house around 11:00 p.m. Instead of going to the garage, A.A. walked around the neighborhood for several hours wearing only a t-shirt, pants, slippers, and a robe. She walked to a nearby school and a couple of houses before returning to the front yard of mother's house. Mother called law enforcement when A.A. first left the house, but officers didn't arrive until around 1:00 a.m., when they found A.A. standing outside the house by herself. According to the officers, it was about 35 degrees out when they found A.A.

While the officers were at the house, they heard mother and A.A. arguing inside the garage. At some point, the officers heard a loud bang, which sounded like mother pushing A.A. against the garage door.

When interviewed by the officers, mother stated she sometimes used a wooden paddle and the poking device to discipline her daughters. But she claimed she only used physical

discipline if the children didn't respond to other forms of punishment, such as time outs and removing their toys.

According to mother, she sometimes made A.A. sleep in the garage because the family and one of A.A.'s therapists had designated it as a "calm" place for the child. At the time of this incident, the garage wasn't insulated and lacked a heating device and thick floor padding, and mother provided A.A. only a blanket to sleep with. The children's stepfather, who also lived in the home, believed mother was doing her best to handle A.A.'s "rebellious" behavior.

The officers interviewed the children and found no marks or bruises on their bodies. Bra. and Bri. believed the entire incident was A.A.'s fault because she wouldn't follow mother's directions. They told the officers mother sometimes hit them with the paddle or other instruments, but they didn't think it was a problem because mother always gives the children other options to calm down before resorting to physical discipline.

The officers arrested mother for child endangerment and the children were detained, but mother was never prosecuted. A few days after the incident, one of the officers who responded to the family's home told the Department that he believed the children would be safe in mother's custody and that "less restrictive intervention" by law enforcement and the Department would have benefitted the family. The officer believed mother was just an "exasperated parent trying to deal and cope with at least two children with mental health issues."

The Department filed a dependency petition on the children's behalf, alleging: (1) mother physically abused A.A. by striking the child on her lower back and buttocks with a paddle and by poking her with a handheld device, which placed A.A.,

4

Bra., and Bri. at serious risk of suffering physical harm (Welf. & Inst. Code,[1] § 300, subds. (a), (b), (j); a-1, b-1, & j-1 allegations); (2) mother created a detrimental and dangerous home environment by excluding A.A. from the family's home and forcing the child to spend time in an uninsulated garage at night, during cold weather, and without adult supervision, which placed the children at serious risk of suffering physical harm (§ 300, subds. (b), (j); b-2 & j-2 allegations); (3) mother neglected A.A.'s mental health issues, including depression and aggressive behavior, by failing to ensure A.A. took her prescribed medication and received treatment from a therapist, which placed the children at serious risk of suffering physical harm (§ 300, subds. (b), (j); b-3 & j-3 allegations); and (4) mother emotionally abused A.A. by excluding the child from the family's home and by neglecting the child's mental health issues (§ 300, subd. (c); c-1 allegation).

At the detention hearing, the court found father was the children's presumed parent. The court detained the children from their parents' custody and allowed mother monitored visits after finding the petition alleged a prima facie case under section 300, subdivisions (a), (b), (c), and (j).

2.      **Jurisdiction and Disposition**

After the detention hearing, the Department interviewed the family again. Mother refused to comment on the petition's allegations.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

According to A.A., mother had used the wooden paddle, the poking device, a belt, and a rubber spatula to hit all three children before the March 2021 incident. Mother usually struck the children on their hands or buttocks, but if they didn't hold out their hands she would hit them all over their bodies. Mother had left marks on A.A.'s body before, but " 'none [were] still there.' "

Before the underlying incident, mother had once banished A.A. to the garage for two days. During that time, mother would lock the door to the house, and A.A. could only go inside to do chores. Mother provided A.A. a bowl of water to wash her face and brush her teeth, a trashcan to use as a toilet, and wipes to clean herself with. A.A. acknowledged that she sometimes used the garage on her own to "cool off," but during those times she was always free to go back inside the house.

Before the Department initiated this case, A.A. hadn't taken her medication for three weeks. Mother thought the child was taking her medication, but A.A. would just hold the pills in her mouth and act like she swallowed them.

 According to Bra. and Bri., on the night of the incident, A.A. was acting disrespectful and talking "smack" toward mother, so mother gave her a " 'little whoopin'.' " The sisters explained that a " 'whoopin' ' " occurs when mother uses her hand or a paddle to strike the children's hands. Bra. stated it usually doesn't hurt when mother hits her, instead it's just a light tap that sometimes tickles. The sisters believed mother made A.A. sleep in the garage so the child could be " 'appreciative' " of everything mother provided for the family.

The court held the jurisdiction and disposition hearing in June 2021. Mother acknowledged she did not have the "best relationship" with A.A., but she "denie[d] using any form of

discipline as to her children." Specifically, as to A.A., she denied "ever striking" or "poking" the child. Mother also argued she was diligent in attending to A.A.'s mental health issues and that her use of the garage as a timeout space for A.A. was reasonable because one of the child's therapists had designated it as a "calming place."

The court sustained all the allegations as pled in the petition. The court found mother's use of physical discipline on A.A. was unreasonable and amounted to abuse, especially as it related to mother's use of the poking device to strike the child, and that such conduct placed all three children at serious risk of physical harm. The court also found that mother created a dangerous home environment for the children by forcing A.A. to sleep by herself in an uninsulated garage and to stay outside the home late at night and in the cold without adult supervision. Finally, the court found mother emotionally abused and neglected A.A. by using inappropriate forms of punishment that aggravated the child's mental health issues and by failing to arrange for the child to receive appropriate mental health treatment for several months leading up to the March 2021 incident.

The court declared all three children dependents of the court. The court removed A.A. from mother's custody and placed her in father's custody while allowing Bri. and Bra. to remain in mother's home. The court ordered the Department to provide the parents family maintenance and enhancement services.

Mother appeals.

## DISCUSSION

Mother contends the court erred in sustaining the children's petition because the Department failed to prove she physically or emotionally abused A.A. or neglected the child's mental health issues. As we explain, substantial evidence supports the court's jurisdiction findings.

### 1. Applicable Law and Standard of Review

Under section 300, subdivision (a), a juvenile court may exercise jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally ... by the child's parent[.]" The statute excludes from its definition of serious physical harm "reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." (§ 300, subd. (a).)

Under section 300, subdivision (b)(1), a juvenile court may exercise jurisdiction over a child "if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent ... to adequately supervise or protect the child ... .' " (*In re E.E.* (2020) 49 Cal.App.5th 195, 205, italics omitted.) The Department is not required to prove the parent's conduct was negligent or otherwise blameworthy to support a finding under this subdivision. (*In re R.T.* (2017) 3 Cal.5th 622, 624, 629 (*R.T.*).)

A court may also exercise jurisdiction over a child under section 300, subdivision (j), where the child's sibling has been "abused or neglected" as defined under one of the other subdivisions of section 300, if there is "a substantial risk that the child will be abused or neglected, as defined in those

8

subdivisions." (§ 300, subd. (j).) In determining whether jurisdiction is appropriate under subdivision (j), the court "shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).) Under section 300, subdivision (j), the " 'court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j).' " (*In re I.J.* (2013) 56 Cal.4th 766, 774 (*I.J.*).)

The juvenile court doesn't need to wait until a child is seriously injured before asserting jurisdiction if there is evidence that the child is at risk of future harm because of the parent's conduct. (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.) The court may consider past events as an indicator of whether the child faces a current risk of harm because "[a] parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) A parent's denial of wrongdoing or failure to recognize the negative impact of her conduct is also relevant to determining risk under section 300. (*In re Tania S.* (1992) 5 Cal.App.4th 728, 735, fn. 4.)

We review a juvenile court's jurisdiction finding for substantial evidence. (*In re D.C.* (2015) 243 Cal.App.4th 41, 55.) We will affirm the finding if it is supported by evidence that is reasonable, credible, and of solid value. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) " '[W]e look to see if substantial evidence, contradicted or uncontradicted, supports [the court's findings].

9

[Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. [Citations.]" (*R.T.*, *supra*, 3 Cal.5th at p. 633.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*R.V.*, at p. 843.)

## 2. Substantial evidence supports the court's jurisdiction findings.

We begin with mother's challenge to the court's finding that she physically abused A.A., which supports the petition's a-1, b-1, and j-1 allegations. According to mother, insufficient evidence supports the court's finding because her use of various instruments, including a wooden paddle and a poking device, to strike A.A. amounted to nothing more than reasonable physical discipline. We disagree.

As a preliminary matter, mother's conduct falls outside the scope of section 300, subdivision (a)'s exemption for age-appropriate spanking of a child's buttocks. (See § 300, subd. (a) [" 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury"].) While the children told the Department that mother sometimes spanked them on their buttocks with various instruments, there was also evidence that mother struck the children, and especially A.A., on other parts of their bodies. For instance, A.A. reported that mother threw a wooden paddle at her twice on the night of the March 2021 incident, both times hitting the child's torso. A.A. also reported that mother poked her

10

in the chest with a poking device and would hit the children "all over" their bodies if they didn't let her hit their hands or buttocks.

There was substantial evidence to support the court's finding that mother's use of physical punishment on the children was excessive—and not reasonable physical discipline—such that it placed all three children at serious risk of harm under section 300, subdivisions (a) and (b). In *In re D.M.* (2015) 242 Cal.App.4th 634, the reviewing court outlined a set of factors courts should consider when determining whether a parent's use of physical discipline "on a particular occasion falls within (or instead exceeds) the scope of [the] parental right to discipline." (*Id.* at p. 641.) Those factors include: "(1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.'" (*Ibid.*)

As to the first two factors, there was evidence that mother's conduct wasn't genuinely disciplinary and exceeded what was necessary under the circumstances. The children agreed that mother became upset with A.A. on the night of the March 2021 incident because the child was being argumentative and wouldn't follow mother's directions. In response to A.A.'s behavior, mother struck the child three times on her buttocks with a wooden paddle. But mother didn't stop there. Instead, she became angry when A.A. started to walk away from her, throwing the paddle at A.A., striking the child on her lower back. After A.A. grabbed the paddle and gave it back, mother struck A.A. on the torso with it. Mother then left the room and returned with the poking device, which she used to strike A.A. in the chest, before leaving the

room again, only to come back with the paddle, which she again threw at A.A., hitting the child's torso.

It may be true that mother was initially motivated to discipline A.A. when she spanked the child's buttocks. But it was more than reasonable for the court to infer that mother acted out of anger or aggression, instead of a genuine intent to discipline the child, and used methods of punishment that weren't warranted by A.A.'s misbehavior, when she threw a hard object at the child multiple times and pursued the child through the house while continuing to strike her with hard objects.

For similar reasons, the court could infer that the amount of punishment mother used was excessive and dangerous. Mother threw a hard object—the wooden paddle—at A.A. twice on the night of the March 2021 incident. There is little question that throwing hard objects at a child with the intent to hit her poses a serious risk of harm to the child and those around her. Thrown objects could easily strike a vulnerable or critical part of a child's body, such as her head, and cause serious injury.

In addition to her conduct during the March 2021 incident, there was evidence that mother used excessive forms of physical punishment on the children in the past. A.A. told the Department that mother would sometimes hit the children "all over" their bodies with a rubber spatula if they didn't let her strike their hands or buttocks when they got in trouble. A.A. also claimed that mother had left marks on the child's body, although they had since disappeared, when she struck the child in the past.

It was also reasonable for the court to find mother's conduct continued to pose a risk of harm to the children. When mother spoke to the Department and law enforcement shortly after the March 2021 incident, she stated that she believed her use of

physical discipline on the children was reasonable. And, by the time of the jurisdiction and disposition hearing, mother denied ever striking any of her children or otherwise using physical discipline on them. In light of mother's initial minimization of her conduct and subsequent denial of any wrongdoing, the court could infer that mother was likely to engage in similar conduct in the future, thereby continuing to pose a risk of serious physical harm to all of her children. (See *In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' "].)

Mother doesn't directly challenge the court's finding establishing jurisdiction over Bra. and Bri. under section 300, subdivision (j)(1) based on mother's physical abuse of A.A. Nevertheless, for all the reasons we just discussed, the court's finding that mother's use of excessive physical punishment on A.A. under section 300, subdivisions (a) and (b) also supports the court's exercise of jurisdiction over Bra. and Bri. under subdivision (j)(1). (See *I.J.*, *supra*, 56 Cal.4th at p. 774 [a court has " 'greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]".)

In short, substantial evidence supports the court's findings sustaining the petition's a-1, b-1, and j-1 allegations. Because those findings are sufficient to maintain dependency jurisdiction over all three children, and because mother doesn't challenge any aspect of the court's disposition orders, we need not address mother's challenge to the sufficiency of the evidence to support the court's findings sustaining the remaining allegations. (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452 [a single jurisdiction

13

finding is sufficient to maintain dependency jurisdiction over a child].)

## DISPOSITION

The juvenile court's jurisdiction findings and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.

14