Filed 1/31/24  In re B.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.B., et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. M.B., Defendant and Appellant. | E081377 (Super.Ct.No. DPSW2300072) OPINION |

APPEAL from the Superior Court of Riverside County.  Sean P. Crandell, Judge.

Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

M.B. (Father) and N.B. (Mother; collectively Parents)[1] are the parents of C.B. (Male, born January 2014), T.B. (Male, born May 2016), R.B. (female, born November 2017), and B.B. (female, born December 2018; collectively, the children).  Father appeals from the juvenile court's order removing the children from Father's custody.  For the reasons set forth *post*, we affirm the trial court's findings and orders.

## FACTUAL AND PROCEDURAL HISTORY

On March 15, 2023, the Riverside County Department of Public Social Services (the Department) filed a Welfare and Institutions Code[2] section 300 petition on behalf of the children; the children were not detained.

In an out-of-custody initial hearing report filed on March 15, 2023, the social worker stated that a temporary restraining order (TRO) was issued to protect Mother and the children from Father due to domestic violence.  Father was granted visitation with the children.

On December 30, 2022, the TRO was amended.  The court ordered Father to have no contact with Mother, except for brief and peaceful contacts to communicate about court-ordered visits via "Talking Parents."  The hearing on the permanent restraining order was continued to March 28, 2023.

---

[1]  Mother is not a party to this appeal.

[2]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The report also provided that on February 15, 2023, the Department received a 10-day referral with allegations of domestic violence and general neglect by Parents. When law enforcement arrived, Father claimed that Mother "threw a bong to the floor, slapped him, and punched him on the back of the head." Father reported that C.B. witnessed the incident. C.B., however, told law enforcement that Mother did not hit Father.

In the report, the social worker stated that on February 21, 2023, when a social worker made an unannounced home visit, Mother was upset with Father. Mother stated that Father had made false allegations to get back at her for the Department's prior investigation. Thereafter, in front of the social worker and the children, Parents exchanged words and argued.

Father told the social worker that the "allegations were true and that he had called law enforcement himself . . . to protect himself from further allegations against him." Father stated that Parents have argued less and the children never witnessed physical violence.

The social worker reported that Mother "continued to be upset at the father and told me that she never hit him. She said she was tired of the father and his behavior. She expressed that all responsibility fell on her (household expenses, work, and care of the children)." Mother briefly left; Father indicated she was going "for a walk to cool off."

Additionally, the social worker reported that "[t]he children were present as the parents argued with one another. . . . The children were friendly and did not appear to be scared." When the social worker asked Father if she could talk privately with the children, Father declined. Father claimed that the social worker "could speak to the

3

children and ask them questions, but only in his presence and stated that he would not interfere, however wanted to listen in on what the children were being asked." The social worker stated that the children "were friendly and appeared comfortable in the presence of the father." When Father asked T.B. if the parents had been arguing all day, T.B. "nodded his head up and down to say yes. The father asked T.B. again, and then [T.B.] nodded his head side to side to say no."

After Mother returned, she decided to leave the home with the children and go ~~with the children~~ to her uncle's house. Mother told the social worker that "she would remove herself and the children from the situation as it was clear that the father was not going to leave."

After Mother left, Father told the social worker that he was concerned about Mother's mental health. The social worker "pointed out that the current environment between him and the mother was not healthy for the children, regardless of who was at fault. [The social worker] stressed the importance of adhering to the orders set in the TRO and advised [Father] to continue services."

The social worker further reported that on February 22, 2023, Mother informed the social worker that Mother had received assistance to obtain hotel vouchers so she and the children could stay in a secure location. Mother left her uncle's home after one night "because of the snow and inconvenience as his home was farther from the children's school."

On February 28, 2023, the Department received an immediate response referral alleging general neglect. It was reported that Mother and the children were homeless and

4

staying in a hotel, and that "the mother had stated that she would be leaving the children alone while she went to work. There was concern that the children would be left unattended."

When a social worker responded, she "found the children to be safe and in the care of the mother. The mother was reported to be cooperative and she informed [the social worker] that she had been calling off of work in order to care for the children. The mother reported that the allegations were a miscommunication and that she would never leave the children alone."

When Mother called her social worker the following day, Mother told the social worker that "she was concerned and worried because . . . someone called [the Department] on her stating that she had left the children alone in the hotel room while she went to work. She reiterated that those allegations were absolutely not true and that she would never leave the children alone." Mother also informed her social worker that prior to the Department's arrival, "law enforcement was there and told her that they were responding to a 911 call. The officers told the mother that someone had called 911 from her location and hung up." Mother stated that no one dialed 911 from the room. "The police left and then shortly after the father sent her a message telling her that he was going to call the police on her." After these events, Mother felt unsafe at the hotel "because she was worried the father knew where she was staying at." The next day, after Mother took the children to school, she made arrangements to stay in Hemet with the maternal great-grandmother.

When the social worker contacted Father, he denied calling law enforcement on Mother or knowing Mother's location.

The report also provided that in the evening of March 1, 2023, the social worker visited the children at maternal great-grandmother's home. The children were observed to be clean and well-groomed. The children denied being left alone. During this visit, Mother told the social worker that she could not find a sitter to watch the children while she worked. Mother was working to change the TRO to allow Father visitation from Friday to Sunday. Although Mother had concerns about Father's behavior toward her, she denied having concerns about his ability to care for the children.

On March 7, 2023, Mother filed an amended request for a domestic violence restraining order. Mother alleged that Father (1) had been in constant violation of the TRO by making unwanted contact via phone and text messages; (2) had harassed her and called her place of employment; (3) had logged into Mother's work account without her consent to check her work schedule; (4) had threatened Mother and told her that he was going to put something in her car, and that Mother better find it before she got pulled over; and (5) had threatened to kill himself if Mother was not in his life.

On March 8, 2023, Father called the social worker stating that he was concerned about a 24-year-old man Mother was dating. Father believed Mother was pregnant with the man's child. Moreover, Father was concerned about the supervision of the children while Mother worked. The social worker told Father to go to family law court to address custody matters and to refrain from negative interactions with Mother.

6

The next day, Mother called the social worker to report that she was hospitalized because she was sexually assaulted the previous night. The children were staying with Father and had not been present. After determining that the family needed more support, the Department decided to file an out-of-custody petition.

After the sexual assault, Mother and the children moved back in with Father. Father stated that he would stay in a trailer next to the home.

On March 11, 2023, the Department received a third referral alleging general neglect by Parents. "It was reported that the family had starting attending church and that the children were observed to be unkempt. The referral stated that the children looked like they hadn't taken a shower in days and their clothes were dirty." Moreover, the report alleged that Parents were using drugs. In addition, Mother "was looking for shelter due to domestic violence." After receiving shelter from a church member, Mother "was observed to be drugged up. The mother had informed this individual that she had been drugged, raped, and left outside a hotel."

On March 13, 2023, the social worker visited the family. Parents denied using controlled substances. Parents told the social worker that although they occasionally smoked marijuana, they never did "in the presence of the children and not at the same time." Parents agreed to random drug tests. As to the hygiene of the children, Parents stated the children showered at the paternal grandmother's home, which is separate from the parent's trailer home, but located on the same properly and it is [within] walking distance."

7

The three older children, C.B., T.B., and R.B., each stated that verbal domestic disputes between Mother and Father continued. C.B. stated that police have been to their home many times.

In the report, the social worker stated that a review of the Department's database uncovered a prior child welfare history for Parents. In that case, on November 14, 2022, the Department received a referral alleging general neglect and emotional and physical abuse of the children. Mother contacted law enforcement to report domestic violence by Father in the presence of the children. Neither Mother nor the children had any visible marks or bruises.

According to the referral on the prior case, Mother stated that Father "had raped her a month ago, but she did not report the incident. The mother said father was verbally and physically abusive to the children." Moreover, Mother claimed that Father "had smacked [T.B.]." When law enforcement responded, Father "was arrested and EPO served." Father, however, denied the allegations and stated "that he and the mother were involved in a scuffle over the phone."

In the prior case, the Department summarized that "it is evident that the parents engaged in a domestic dispute that was not handled properly. Per the police report, the children reported witnessing verbal arguments between the parents, however there were no indications that they had witnessed domestic violence and no disclosures were made. There was no willful harming or injuring of the children by the parents. There was no indication that the children had been impacted by the parent's [*sic*] actions. The children

were observed to be attached to both parents and overall appeared happy."  A no-negative-contact order was established.

In the out-of-custody report, the Department provided that Father had two convictions for possession of controlled substances in 2005 and 2006.  Moreover, on November 14, 2023, law enforcement reported that "[F]ather was arrested due to domestic violence and an EPO was issued."

The social worker reported that "[t]here is a substantial danger to the physical health of the children or the children are suffering severe emotional damage, and there are no reasonable means by which the children's physical or emotional health may be protected without Court intervention."

Furthermore, the social worker expressed concern for Parents' history of domestic violence, the escalation of Parents' arguments, and the children witnessing the ongoing domestic dispute between Parents.  "The children appear un-phased by the altercations and it appears the domestic disputes between the parents is a very normal occurrence."  The social worker noted that "[d]espite a TRO in place, the parents are in constant violation of it and minimize the allegations after the fact through their actions.  They have poor communication, continue to cohabitate in a negative environment, and call law enforcement frequently."  Thereafter, the social worker expressed its concern "that the mother and the father will continue to engage in domestic violence, whether verbally or physically, in the presence of the children, which will undoubtedly result in the children suffering from further emotional and possibly physical harm."

The Department filed an addendum report on March 27, 2023. In the report, the social worker stated that Father called her on March 17, 2023. Father reported that B.B. told Father that Mother's friend, D., kissed B.B. on the lips and smoked marijuana while caring for B.B. Mother denied the allegations. Mother "said that [D.] did not provide care for [B.B.] and that he had never kissed her on the lips. The mother stated that the father was just making up false allegations because she did not want to be with him. She expressed concerns that the father was going to continue to make false allegations and was not going to stop until she returned back home with him."

On March 20, 2023, Mother reported that Father failed to adhere to the TRO visitation schedule. Father did not allow Mother to pick up C.B. after a March 19, 2023, visit with Father. Moreover, Father continued to question the children about how Mother spent her time and what Mother did. Mother told the social worker that she quit her job to care for the children. Mother also stated that D. had not cared for the children since Father's accusations. Additionally, Mother denied being in a relationship with D. or being pregnant.

The social worker reported that on March 23, 2023, Father left a message. Father stated that when B.B., who was with Mother and D., answered Father's call, Father saw D. smoking marijuana in the presence of B.B. When the social worker spoke with Mother, she stated that she and B.B. were at D.'s house while waiting for the older three children to get out of school. Mother denied Father's accusation that D. was smoking marijuana. Mother stated Father was making up allegations because he was angry that

10

Mother was at D.'s house. Mother told the social worker that Mother often stayed at D.'s house, which was near the children's school, to save money on gas and time.

At the out-of-custody hearing on March 30, 2023, Parents and the children were present and counsel were appointed to represent them. The children's counsel argued that the children appeared to need services and expressed concerns about Father's continued violation of the restraining order. The children's counsel requested that the court detain the children from Father's custody.

Mother's counsel submitted on the children's counsel's request and the Department's recommendations. Father's counsel argued against detention from Father; he argued that the TRO was a no-negative-contact order.

After reviewing the TRO, the juvenile court found it to be a no-contact order, not a no-negative-contact order. To avoid confusion regarding the TRO, the court stated that it would issue a new TRO and continued the hearing. The court stated that "a lot of the craziness that's going on, including for some reason a 911 call coming from the hotel room, the social workers coming to the hotel room, it has the appearance that father is using the government to stalk the mother." Father's counsel argued that Father had not "willfully" violated the TRO. Instead, Father misunderstood the terms.

The Department's counsel then stated that "the Department is in agreement with detaining from the father. There is in the report—even if it was a no-negative contact, that was already violated even if it was just a no-negative contact."

The children's counsel then indicated that "in speaking with the [children], they were concerned about the violence in the home. They indicated that there is hitting, and I

11

would also indicate that father was arrested for domestic violence in November, and then there is harassment going on. Father has been calling law enforcement on the mother reporting concerns about the children's welfare. So I am concerned about father's behaviors. [¶] I know dad is blaming the domestic violence on the mother's mental health. It seems as if mother is addressing that right now. But father does have an arrest history for domestic violence in November."

Mother's counsel joined in the comments made by the children's counsel, and stated, "Mother did indicate to me she doesn't feel that the father is necessarily a danger to the children. She feels that his problems are with the mother, but I do think that carries over and that there are concerns with regard to father's ability to separate that."

Thereafter, the juvenile court allowed Mother to leave the courtroom to care for the children and took "some time to review the entirety of the DVHE-2206554 case." The court proceeded to state, "at this time I am removing the children from their father and placing the children in the care and custody of the mother." The court also issued a "no-contact, 100-yard, stay away restraining order. . . . Dad's only contact with the children will be in supervised visitation, supervised by the Department, two times a week, one hour per visit. . . . [¶] . . . [¶] . . . I'm going to make an order that the children are to have no contact nor stay at the homes of parties not approved by the Department, nor are those parties to be in the mother's home."

After allowing comments by the attorneys, the court noted: "Okay. So, folks, you know, dad is crying in the back of the room. I have no idea whether that's real or crocodile tears. Frankly, dad comes off in all of these reports as manipulative, seeking to

12

make the mother look like she is crazy, pushing the boundaries on what the restraining order allows, trying to use the government, including the police and the Department, to harass mother. It doesn't seem that any of his allegations have been borne out, that people are smoking pot around the children, that [D.] has done any of the things that he said. Of course, I'm concerned about these allegations and thus the reason I'm making the orders."

The juvenile court stated, "[i]t seems to me extremely unusual that the police and CPS would show up back-to-back at the motel when mother was there, and I accept mother's representation that dad just keeps contacting her for no reason related to the— unrelated to the purposes which would be permitted by the restraining order. . . . I mean, just to the Court[,] it's a classic coercive control domestic violence situation. . . . [¶] Frankly, because of dad's manipulative nature and his inability to abide by court orders, I'm not comfortable allowing him to have unsupervised contact with the children. I don't see why his situation merits anything other that what would be a standard visitation order."

On April 19, 2023, the Department filed its jurisdiction/disposition report. In the report, the Department asked the juvenile court to find the allegations in its petition true, order family maintenance to Mother, and family reunification services to Father.

The social worker stated that the Department attempted to interview the children on April 14, 2023. However, C.B., T.B., and R.B. refused to be interviewed. They all reported that they felt safe at home. Moreover, the Department was unable to interview

13

B.B. because of her inability to pay attention. Furthermore, the Department was unable to interview Parents "as the Department was denied permission to interview" them.

During the reporting period, Father had two visits with the children. The first visit became chaotic after 35 minutes when the children ran the halls, jumped on furniture, and disregarded Father's directives. The second visit lasted two hours; Father was able to keep the children occupied.

At the contested jurisdiction/disposition hearing on May 22, 2023, Parents were present with their counsel. Mother's counsel requested that the TRO be made permanent and the children's counsel submitted on the Department's recommendations. Father's counsel presented Father's stipulated testimony wherein he disputed the allegation that he abused marijuana. Father stated he occasionally used marijuana but did not abuse it or use it while with the children.

The Department's counsel argued that the report contained information regarding Father's issue with marijuana, and that his behavior was concerning. Counsel argued that "there's information in the report that would suggest that father does have an issue with marijuana use. In particular, . . ., father's behavior in this case is very concerning, . . . that it's quite possible that his use of controlled substances, including marijuana, is part of the reason his behavior is so concerning at this point in time. His behavior is akin to almost stalking of the mother." The children's and Mother's counsels joined with the Department's counsel's argument.

The juvenile court recognized that "there has been ongoing history of domestic violence in this relationship" and that both parents admitted to ongoing use of marijuana.

14

When the court asked for further comments, Father's counsel argued against removing the children from his care. Counsel for the Department argued that according to C.B., Father lied about Mother hitting Father, and instead, Father yelled at Mother because she was talking to someone else. Mother's counsel joined with the Department's counsel, and the children's counsel joined with counsel for Mother and the Department.

Thereafter, the juvenile court found that on February 15, 2023, C.B. contradicted Father's statement that Mother was the aggressor. Moreover, the court stated that "the children are being used by the parents, in this case the father, to say things to law enforcement that are not true. And so we have children being dragged into their parents allegations and being psychologically coerced into taking sides and becoming pawns in this action, which to me, that is traumatizing to a little person to have to begin taking sides between mom and dad's dispute. It would cause, in my opinion, a substantial risk of emotional distress to any children who are put in that situation."

Furthermore, the juvenile court expressed concern about Father following or tracking Mother, and noted Mother's concern for her safety. The court remarked that Father is "wrapped up in mom's personal conduct. I think it shows where his focus is" which is consistent with someone who has "control issues and would be concerned about losing their significant other." The juvenile court then noted that Father made statements that he would harm himself if both parties were not going to be together.

Based on the evidence, the juvenile court found that returning the children to Father would place the children at serious harm, or risk of physical harm, or serious harm of emotional or psychological trauma.

15

At the conclusion of the hearing, the juvenile court found the allegations in the petition true, that the children came within section 300, subdivision (b)(1), and declared the children dependents of the court. The court then ordered family maintenance services for Mother; removed physical custody of the children from Father; ordered family reunification services for Father; and approved the Department's case plan. The court also ordered Mother not to allow any unauthorized adults to care for the children; ordered prior visitation orders to remain in full force and effect; authorized a third party to supervise Father's visitation; and authorized the Department to liberalize Father's visitation and to terminate the dependency via ex parte application. Moreover, the juvenile court made the TRO permanent with an expiration date of May 22, 2026, ordered Father not to contact Mother and to stay at least 100 yards away from Mother's home and workplace. (CT 229, 232-233, 243.)

On May 22, 2023, Father filed a notice of appeal from the juvenile court's orders at the jurisdiction/disposition hearing.

## DISCUSSION

A.  <u>THE TRIAL COURT'S ORDER REMOVING THE CHILDREN FROM FATHER IS SUPPORTED BY SUBSTANTIAL EVIDENCE</u>

Father contends that "substantial evidence did not support the juvenile court's dispositional order removing the children from Father's home and there were reasonable means of protecting their welfare without removal."

16

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [:]  [¶]  (1) [That] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody."  (§ 361, subd. (c).)

We review a juvenile court's dispositional order removing a child from parental custody for substantial evidence, " 'bearing in mind the heightened burden of proof.' " (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.)  "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 695 (*Isayah C.*).)  Still, the appellant bears the burden of showing " 'there is no evidence of a sufficiently substantial nature' " to support the dispositional removal order.  (*In re D.C.* (2015) 243 Cal.App.4th 41, 55, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.)

With the facts mentioned above in mind, we disagree with Father and find that substantial evidence supports the juvenile court's finding that removing the children from Father's custody was necessary to protect the children's physical, developmental, and emotional well-being, and there were no other reasonable means by which the children's well-being could be protected without removing them from Father's custody.  (§ 361, subd. (c)(2).)

17

1. *SUBSTANTIAL RISK OF HARM*

Father contends that "no evidence was presented of a substantial risk of harm to the children if returned home." We disagree.

At the jurisdiction/disposition hearing, before the juvenile court pronounced its decision, the court found that Father used the children to further his interests. The court expressed concerns because not only did the children witness domestic violence between Parents, the children were "being used by the parents, in this case the father, to say things to law enforcement that are not true. And so we have children being dragged into their parents allegations and being psychologically coerced into taking sides and becoming pawns in this action, which to me, that is traumatizing to a little person to have to begin taking sides between mom and dad's dispute." The court then stated such behavior "would cause, in my opinion, a substantial risk of emotional distress to any children who are put in that situation."

The juvenile court went on to state that Father followed and tracked Mother, which caused Mother to be concerned about her safety. The court stated that Father's behavior showed that he is "wrapped up in mom's personal conduct. I think it shows where his focus is," on the mom and not the children. Furthermore, the court noted Father's previous statements that he would harm himself if Mother did not return to Father.

Based on the court's observation of the parties in the case, including Parents, the children, and social workers; and the reports filed and evidence presented, the court found that "it would not be in the [children's] best interests to be returned to dad at this

18

point." We agree with the juvenile court and find that substantial evidence supports the court's finding.

In this case, as provided in detail *ante*, on February 15, 2023, Father reported that Mother hit Father, and C.B. witnessed the incident. C.B., however, denied that Mother hit Father. Instead, C.B. stated that it was Father who actually hurt Mother. C.B. told law enforcement that Father yelled at Mother because she was talking to someone else. C.B. also stated that Mother was trying to sleep and Father hurt her. C.B. stated that law enforcement had been to their home many times. The first time law enforcement came, Father went to the police station "to tell things on mom which she did not do." T.B. also witnessed Parents arguing and yelling at each other, even when Father left the house. The older three children also reported ongoing verbal domestic disputes between Parents. R.B. stated it made her sad.

When Father visited the children, he interrogated the children about Mother's personal life instead of interacting and showing interest in the children.

On February 28, 2023, the Department received an immediate response referral regarding Mother leaving the children in a hotel while she went to work. Both the Department and law enforcement found the allegation to be untrue. Mother believed Father made the report because he told her he was going to call the police on Mother.

In March of 2023, Father told the social worker he was concerned about Mother's relationship with D.; that D. smoked marijuana in front of B.B. and kissed her. Father's accusations were never substantiated.

19

Notwithstanding the substantial evidence that supports the court's removal order, Father argues that the removal was inappropriate in the absence of a risk of physical harm. In support of his argument, Father relies on *Isayah C.*, *supra*, 118 Cal.App.4th at 698, and contends: "[S]ection 361, subdivision (c)(1) requires that there be a 'threat to physical safety, not merely emotional well-being, in order to justify removal.' " Father's contention is without merit.

In *Isayah C.*, the court noted that "case law, while not discussing the issue explicitly, appears to interpret paragraph (1) of section 361(c) to require a threat to physical safety, not merely emotional well-being, in order to justify removal. (See *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288-290 . . . )" (*In re Isayah C.*, *supra*, 118 ca4th at p. 698.) The court then agreed with the interpretation that a threat of physical harm was required for removal. (*Ibid.*)

However, four years later, in *In re H.E.* (2008) 169 Cal.App.4th 710 (*H.E.*), the same court, First District, Division Two, revisited its opinion in *Isayah C.* and limited its holding.

In *H.E.*, the mother contended that "after *Isayah C.,* it is never enough to justify removal unless there is also a risk of *physical* harm." (*H.E.*, *supra*, 169 Cal.App.4th at p. 719.) After analyzing the *Isayah C.* opinion at length, the court stated: "A close look at *Isayah C.* reveals that, notwithstanding its broad pronouncement, the case presented neither proof, allegations, nor contentions about emotional harm. We therefore limit the holding to an unremarkable deduction that, where the subdivision requires risk of emotional *or* physical harm and there is no risk of emotional harm, there must be risk of

physical harm. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, . . . ['language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts'].)" (*H.E.*, *supra*, 169 Cal.App.4th at pp. 721-722.)

Although *H.E.* limited *Isayah C.* and allows a threat of emotional harm to justify removing a child from their parent, Father fails to address *H.E.* in his briefs. Instead, Father cites *In re Jasmine G.* (2000) 82 Cal.App.4th 282 (*Jasmine G.*) to further bolster his contention that "[t]he statutory language of section 361[, subdivision ](c)(1) requires a threat to physical safety, not merely emotional well-being, in order to justify removal." *Jasmine G.* does not support Father's argument.

*Jasmine G.*, *supra*, 82 Cal.App.4th 282, was decided on July 17, 2000—four years prior to *Isayah C.* and eight years prior to *H.E.* In *Isayah C.*, the court cited to *Jasmine G.* when stating that section 361, subdivision (c), "require[s] a threat to physical safety, not merely emotional well-being, in order to justify removal." (*Isayah C.*, *supra*, 118 Cal.App.4th at p. 698.) However, as provided above, *H.E.* limited the holding in *Isayah C.*

Although *H.E.* has expanded the holding in *Isayah C.* to allow the risk of emotional harm for removal, Father has failed to analyze the impact of *H.E.* on either *Isayah C.* or *Jasmine G.* We find Father's reliance on *Isayah C.* and *Jasmine G.* to be unavailing.

In sum, we find that substantial evidence supports the juvenile court's finding that it was in the children's best interest to be removed from Father's custody.

21

## 2. *ALTERNATIVES TO REMOVAL*

On appeal, Father also contends that "the juvenile court failed to consider alternatives to removal."

"The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) In reviewing an order for abuse of discretion, we " 'must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child.' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) "The trial court is accorded wide discretion and its determination will not be disturbed on appeal absent 'a manifest of showing of abuse.' " (*Ibid.*)

In this case, Father argues that "there is no indication the court considered less drastic measures before making the necessary statutory determination that there are no reasonable means by which the children's physical health could be protected short of removal." In support of his argument, Father relies on *In re Henry V.* (2004) 119 Cal.App.4th 522 (*Henry V.*). *Henry V.*, however, is distinguishable.

*Henry V.* involved a child who was removed from his parents because he had three burns likely caused by a curling iron. (*Henry V.*, *supra*, 119 Cal.App.4th at pp. 525, 527.) The juvenile court removed the child from the home, and the appellate court reversed the removal order. The appellate court held that the juvenile court erred because

22

there were reasonable means to protect the child without depriving his parents of custody. (*Id.* at pp. 528-530.)  The appellate court found the physical abuse to be a single occurrence, and neither the child protective services agency nor the juvenile court considered the incident to be an obstacle to the mother reunifying with the child in the near future.  (*Id.* at p. 529.)  The appellate court found that appropriate services could be provided to the mother and the child in the family home, including in-home bonding services, public health nursing services, and unannounced visits.  (*Ibid.*)  Moreover, the court of appeal reversed because it was unclear whether the juvenile court applied the clear and convincing standard in making its dispositional findings.  (*Id.* at pp. 529-530.)

In this case, unlike *Henry V.*, the juvenile court considered reasonable alternatives to removal.  At the jurisdiction/disposition hearing, the following facts were presented to the court again:  The Department initially placed the children with Mother and Father, and filed an out-of-custody petition.  Father, however, continued to harass Mother and interrogated the children about Mother's whereabouts and with whom Mother spent her time.  Because Mother did not want to be with Father, Father became upset, made false allegations about Mother, and stalked Mother.  Father also obtained Mother's confidential address from the children and made an unfounded welfare check referral. Moreover, Father expressed that he would harm himself if his relationship with Mother ended.  The juvenile court noted Father's behavior and found his actions, which included violating the TRO, harmful to the children.

Notwithstanding these facts, Father's counsel requested that Father be given family maintenance for weekends, instead of removing the children from his custody.

23

"Both parents are in an equal position as far as the restraining order. They're separate from their children. They do not live together. They do not live in the same city. So I think that it's wholly appropriate at this time for [Father] to be given family maintenance. And I understand that there's a domestic violence restraining order in this case that existed prior. *Thus, the family maintenance would cap at the visits in line with that order which is my request, Your Honor, he be given family maintenance for weekends in line with the previous restraining order in this case*."

After Father's counsel presented further argument and other counsel gave follow-up arguments, the juvenile court summarized the facts presented to the court. The juvenile court stated: "When you take into consideration my thought that I find it's a reasonable inference that dad did make comments he would harm himself in combination with what I'm hearing today that both parties are not going to be together, I think the Court, at least at this point, has serious concerns that dad could do something that would harm himself. Those are further reasons why returning the children back to the father at this point, unsupervised, as [Father's counsel] is suggesting, would place the children at serious harm, or risk of physical harm, or serious harm of emotional or psychological trauma. It would not be in the [children's] best interests to be returned to dad at this point. [¶] I want to just juxtapose those comments. I'm not here making these comments. I'm here to make a finding if it is the right thing to do as to whether or not I'm going to grant family maintenance or I'm going to remove and grant family reunification. One of the things I stated is why I'm going to find that it would not be in the children's best interests to go back to dad at this point."

24

After further discussion from counsels representing the parties, the court stated "So the Court is going to find that reasonable efforts were made to prevent or eliminate the need from removal of the children." Therefore, we find Father's argument that "there is no indication the court considered less drastic measures before making the necessary statutory determination that there are no reasonable means by which the children's physical health could be protected short or removal" to be unavailing.

Additionally, unlike *Henry V.*, the juvenile court made its removal order after finding clear and convincing evidence: "The Court does find clear and convincing evidence of the circumstances of 361.5[, subdivision ](c) as to father, and the physical custody of the children is removed from the father."

Based on the above, we find that substantial evidence supports the court's order removing the children from Father.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                    Acting P. J.

We concur:


CODRINGTON
                                J.


FIELDS
                                J.

25